## WILLIAMSON et al. v. COMMISSIONER OF INTERNAL REVENUE.

### No. 6537.

United States Court of Appeals
Fourth Circuit.

Argued Jan. 15, 1953.

Decided Feb. 17, 1953.

John H. Lumpkin, Columbia, S. C. (John C. Bruton, Columbia, S. C., H. Hayne Crum, Denmark, S. C., Boyd, Bruton & Lumpkin, Columbia, S. C., and Crum & Crum, Denmark, S. C., on the brief), for petitioners.

Carolyn R. Just, Sp. Asst. to Atty. Gen. (Charles S. Lyon, Asst. Atty. Gen., Ellis N. Slack, Helen Goodner and Alonzo W. Watson, Sp. Assts. to Atty. Gen., on the brief), for respondent.

Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.

DOBIE, Circuit Judge.

This is an appeal by the taxpayers from decisions of the Tax Court of the United States determining a deficiency in federal income tax for the calendar years 1945 and 1946. While the asserted income tax liability for the year 1945 involves only the petitioner, John W. Williamson, he and his wife, Inez Williamson, filed a joint return for the year 1946. Since both cases involved the identical issue, they were consolidated for trial; and, though separate decisions were made for each year, only one opinion was rendered and a joint petition for review was filed.

The taxpayer, John W. Williamson, is 64 years of age. His business during most of his adult life has involved cotton. Since 1940 his activities with respect to cotton have included the following: (a) ownership of some 1,000 or 1,200 acres of land in or near Norway, South Carolina, which was farmed by sharecroppers and in which cotton was an important crop; (b) ownership and operation of a cotton gin in Norway, South Carolina; (c) ownership and operation of a cotton warehouse, bonded under federal laws; (d) ownership and operation of two cotton seed warehouses; and (e) ownership and operation of a small "mercantile" store which sold fertilizer and other supplies to nearby farmers. The store, warehouses, and gin were within comparatively short distances of each other, and were close to a railroad siding.

It was the practice of farmers in the vicinity of Norway, both taxpayer's sharecroppers as well as others, to have their cotton brought to taxpayer's gin, and after it was ginned to have their bales placed on the railroad siding. Moreover, it was expected of taxpayer and it was customary for him, each year, to purchase the bulk of such baled cotton from the farmers, usually about 80 per cent of the cotton

566

which passed through his gin. In purchasing such cotton each year, it was taxpayer's intention to resell at a profit. Since many of the farmers were indebted to him for fertilizer and other supplies which had been sold to them at taxpayer's store, his purchase of their cotton enabled him to effect collection on such indebtedness. It was also a necessary competitive practice since there was another gin located nearby.

In disposing of the cotton thus acquired, the taxpayer had several alternatives open to him. He could resell the cotton at once in what is known as a "spot" sale, thereby realizing a small profit. A "spot" transaction, as its name implies, is one in which the buyer and seller close the transaction immediately, the cotton being delivered and the price fixed and paid on the spot. Prior to 1940, taxpayer utilized this method of sale almost exclusively.

If, however, taxpayer felt that the market would rise during the ensuing months, he could store the cotton in his warehouse, hold it for whatever length of time he wished, and sell whenever it seemed advantageous for him to do so. In 1941, the taxpayer did just this, setting aside some 250 bales of cotton which he held until 1943 and then sold. The profits arising from this sale were treated as a gain on the sale of capital assets and not as ordinary income.

Still another method of sale, one which was employed during the tax years in question and with which the instant controversy is concerned, was the sale of cotton "on call." In a "call" transaction, the cotton is delivered into the possession of the buyer immediately upon the consummation of an agreement but the price to be paid therefor is deferred for future determination. Cotton sold on call immediately becomes the property of the buyer, who assimilates it into his inventory, bears the responsibility for warehouse and insurance charges, and may use or sell the cotton or do with it as he will. The seller is granted a specified period within which he may call the contract. The price determination is based on the market quotation prevailing on the date the actual call is made.

In the interval between the delivery to the buyer and the call by the seller, the risk of market fluctuations is on the seller. A further refinement of this system permits the seller to receive a certain percentage of the current market price immediately upon delivery. Thereafter, if the market advances, he may require the buyer to make additional payments to preserve the margin initially established. If the market retreats, the buyer may make similar demands upon the seller, final settlement between them being based on the market prevailing on the "call date."

In his income tax return for 1945, the taxpayer reported twenty-one sales of cotton on call transactions, and in 1946 he reported thirty-eight such sales. The sales were in bale lots, ranging in size from 4 to 591 bales. It is the position of the taxpayer that the profits thus realized were capital gains and taxable as such. The Tax Court, however, determined that the cotton so sold was not a capital asset within the meaning of Section 117(a) (1) of the Internal Revenue Code, and that the gains from these transactions constituted ordinary income and were not entitled to preferential treatment. Accordingly, the Tax Court sustained deficiencies asserted by the Commissioner for these years in the amounts of $2,725.59 and $35,887.59 respectively. We are asked to review the correctness of these decisions.

The applicable section of the Internal Revenue Code, 26 U.S.C.A. § 117(a) (1) provides:

"§ 117. Capital gains and losses

"(a) *Definitions.* As used in this chapter—

"(1) *Capital assets.* The term 'capital assets' means property held by the taxpayer (whether or not connected with his trade or business), but does not include * * * property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business * * *."

■ The basis of the Tax Court's determination that the cotton in question was not a capital asset was a finding that it

was held by the taxpayer for sale to customers in the ordinary course of his trade or business. The established criteria for determining whether property is so held are the number and proximity of the purchases and sales to one another, Harriss v. Commissioner, 2 Cir., 143 F.2d 279, 280, and the frequency and continuity of the transactions claimed to result in a trade or business. Rollingwood Corp. v. Commissioner, 9 Cir., 190 F.2d 263, 266; Dunlap v. Oldham Lumber Company, 5 Cir., 178 F.2d 781, 784.

■ When these criteria are applied to the facts of the case at bar, it is evident that the Tax Court's determination was correct. The record clearly shows that the taxpayer operated a well integrated cotton business. During the tax years in question, he engaged in over 5,000 purchasing transactions involving some 8,000 bales of cotton. Taxpayer admits that it was his intention to resell the cotton so acquired at a profit and that the purchases and resales thereof were not isolated or occasional transactions but, on the contrary, were a significant and regularly recurring aspect of his overall cotton business. The few cotton merchants to whom he made sales were his regular customers.

■ Also, in this connection, it is not necessary that the business in question be the sole occupation of the taxpayer, or the one to which he devotes a majority of his time. Thus the fact that the taxpayer in the instant case was also engaged in farming, in no way affects the Tax Court's finding that he was engaged in the business of buying and selling cotton. See Harvey v. Commissioner, 9 Cir., 171 F.2d 952; Oliver v. Commissioner, 4 Cir., 138 F.2d 910.

The taxpayer here relies heavily upon the cases of Kemon v. Commissioner, 16 T.C. 1026, and Carl Marks & Co. v. Commissioner, 12 T.C. 1196. In these two cases the question presented involved the proper tax treatment to be accorded gains and losses resulting from the sale of certain securities held by the taxpayers. The taxpayers were well known dealers in securities who kept a quantity of them on hand for sale to its customers but the stocks there in controversy were held by taxpayers in separate "investment accounts."

In each case, the Tax Court made a specific finding that the securities in question were *not* held for sale to customers in the ordinary course of taxpayer's business, but were either originally acquired for speculation and investment, or transferred to the investment account after acquisition for that purpose. On the basis of this finding, the Tax Court held that such securities were capital assets and taxable as such. We find nothing in either decision which lends support to taxpayer's position here.

■ Finally, taxpayer points out that when he sells his cotton in "spot" transactions, he assumes no price risk; but that when he disposes of it on "call" arrangements, he assumes the risk of market fluctuations. It is this difference which lies at the heart of taxpayer's claim for a tax advantage. Despite the holding of the Tax Court that the sales in question were made in the ordinary course of business, the taxpayer contends that the tax consequences where he does not assume the risk of market fluctuations and where he does assume that risk must be different.

■ The short answer to that contention is that the taxing statute recognizes no such distinction, and we are not permitted to create one by judicial interpretation. To do so would not only subvert the purpose of the statute but do violence to its express language. Although counsel have not called our attention to any cases dealing with the sale of commodities on call contracts, and we have found none, it is clear that Congress intended to exclude from the benefits of capital gains taxation property held for disposition in the ordinary course of business. Gruver v. Commissioner, 4 Cir., 142 F.2d 363.

In view of this manifest legislative intent, it is evident, we think, that taxpayer cannot convert property so held into a capital asset merely by deferring the price determination until a future date. Nor can he, by injecting this single, speculative element

into a transaction which in all other respects is an ordinary sale to customers in the course of his business, gain for himself a tax advantage to which he is clearly not entitled.

Accordingly, the judgment of the Tax Court is affirmed.

Affirmed.