**Hugh D. CAMP and Ada C. Camp, Appellants,**

v.

**Hoke MURRAY, District Director of Internal Revenue, formerly Director of Internal Revenue, of the United States of America for the District of Virginia, at Richmond, Appellee.**

No. 7078.

United States Court of Appeals Fourth Circuit.

Argued Oct. 5, 1955.

Decided Nov. 7, 1955.

932

Lewis F. Powell, Jr., Richmond, Va. (H. Brice Graves and Hunton, Williams, Gay, Moore & Powell, Richmond, Va., on brief), for appellants.

Louise Foster, Atty., Department of Justice, Washington, D. C., (H. Brian Holland, Asst. Atty. Gen., and Ellis N. Slack, Atty., Department of Justice, Washington, D. C., on brief), for appellee.

Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.

SOPER, Circuit Judge.

The question in this case is whether certain gains derived by the taxpayer in 1950 from sales of land in Franklin, Virginia, should be classified under § 117 of the Internal Revenue Code of 1939, 26 U.S.C.A. § 117, as capital gains or as profits earned in the ordinary course of a trade or business. The Commissioner of Internal Revenue determined that the gain was taxable as ordinary income and assessed a deficiency which the taxpayer paid. The instant suit for refund was then brought and submitted upon undisputed facts to the District Judge who denied recovery and dismissed the complaint.

The taxpayer in 1926 inherited from his father 80 acres of land situated near Franklin, and in 1938 purchased an adjoining tract of 40 acres from a brother for $50 per acre, and used the whole for pasturing cattle until 1950. The taxpayer was vice president in charge of production and personnel of the Camp Manufacturing Company which operated a paper mill and conducted the principal business activity of the community. The post war increase of the business in 1947 led the company to bring many new employees to Franklin and a critical shortage of house sites arose because none were available in the town and the adjacent lands were owned by the members of the Camp and other families who declined to sell. The taxpayer, as the official in charge of company personnel, was constantly importuned to devote his farm to residential purposes, and, although reluctant to do so, finally yielded to the pressure in 1948 after he had tried and failed to persuade other persons to supply the needed space. Thereupon the transactions occurred which gave rise to this suit.

In October, 1948 the taxpayer transferred 6 acres of his farm to Southampton County to provide a right of way for a highway connecting Franklin with the town of Hunterdale, three miles away, where many of the Camp employees lived and there was thus provided the only direct route between the two communities. In 1950, the taxpayer, having decided to make his farm available, sold 24 acres to his brother for $991.57 per acre, and reported and was taxed upon the profit as a taxable gain. He then caused his remaining 90 acres to be surveyed and platted into 137 lots at a cost of $2143.- 66; he also spent $20,841.80 for the construction of water lines which he conveyed to the town and $15,189.02 for black topping roads which he conveyed to the county.

These activities brought about inquiries for home sites from employees and a few others, without solicitation on the part of the taxpayer. Thereupon he turned over the business of selling the lots to the only real estate firm of brokers in Franklin, agreeing to pay them 7½% commissions on the sales, and they at their own expense inserted advertisements in the local newspaper. His only instruction to the brokers as to sales was to give preference to Camp employees. He fixed the price of the lots so as to equal the amount he could have obtained for the whole tract if he had sold it as undeveloped acreage. He calculated that the lots should produce $1250 an acre over a ten year period in order that the price should approximate $991 per acre at which he had made the sale to his brother.

During 1950 a total of 30 lots were sold of which 23 were sold to the Camp employees. The taxpayer realized a gain on the total sales of $31,431.21, which was about 19% of his total income. The taxpayer did not solicit sales at any time. He had no real estate license and had never subdivided any property other than that now in question. The total time spent by the taxpayer with respect to the entire project was approximately six hours. His duties as vice president of the company during 1950, when a large expansion of the paper mill was in progress, consumed practically all of his business time. The judge found and the record shows that the taxpayer's net profit on the sales did not exceed what he could have obtained by an immediate sale of the land as undeveloped acreage; and hence it cannot be said that he was influenced by the desire for great profit in subdividing the land and selling the lots. His purpose in retaining title and making the subdivision himself was to make sure that the type of building lots needed by employees of his company should be made available. This conclusion is supported by the uncontradicted evidence that if the taxpayer had been interested primarily in selling the property to the best advantage, he could have sold it at prices ranging from $1500 to $2000 an acre.

The problem we are asked to solve has frequently confronted the courts and it has not been found easy to determine under the varying circumstances which have arisen, on which side of the line dividing capital gains from ordinary business profits a particular case falls. A very similar case was considered in a recent decision, not available to the District Judge, in Smith v. Dunn, 5 Cir., 224 F.2d 353, where the taxpayer, a practicing architect for fifty years, inherited 95 acres of land and desired to sell it advantageously, caused it to be surveyed, subdivided and platted by an engineer, and placed in the hands of a real estate broker who sold it at prices tentatively agreed upon without further participation by the owner. It was held that the profits were taxable as capital gains and not as gains in the ordinary course of trade or business. The court suggested that the following tests be used as proper lines of inquiry in such a case: 224 F. 2d 356.

"What was the nature and character of the taxpayer's title to the property, the reason, purpose and intent of the acquisition and ownership and the period of its duration; and whether the property was held primarily for investment or as a part of the taxpayer's 'stock in trade', i. e., as property bought, held and sold for profit?

"What was the vocation of the taxpayer at the time of the sales and prior thereto, whether a real estate broker or engaged in some similar or allied business, having in mind that he may have more than one business; and considering whether the taxpayer maintained only one office and that for his main vocation, and whether his engagement in the additional business was separable from his investment in the property?

"What was the extent of the taxpayer's activity and 'busyness', and whether the additional business was an occupational undertaking to which he habitually devoted time, attention or effort with substantial regularity; and, if the activities

**934**

were conducted through a representative, whether those activities were carried on by the representative as a part of his own business and at his own expense or primarily in behalf of the taxpayer, and particularly the character and degree of supervision or control exercised by the taxpayer over the representative?"

We reach the same conclusion in the pending case. We base it primarily on the combination of circumstances which may be summarized as follows: The taxpayer was not in the real estate business, and devoted very little of his time to the sales of the land. On the contrary, his activities during the period when the property was divided and placed on the market were confined to the responsibilities of active management in a manufacturing business of large size. The property was not acquired for sale but was inherited and the taxpayer was reluctant to sell. He was induced to put the property on the market primarily to provide residential sites for the workers in the plant in whom he had an especial interest and it was not sold primarily for purposes of financial gain. The manner in which the property was platted and to some extent improved to facilitate the sale was influenced by the needs and convenience of the workers of the plant; and the absence of the ordinary surroundings of a business conducted for profit is shown by the uncontradicted evidence that without subdividing or improving the property, it could have been sold as an entirety at a considerable advance over the prices actually obtained by the individual sales during the tax year.

These circumstances distinguish the instant case from those cited by the Commissioner [1] in which the taxpayer was conceded to be a dealer in the business under investigation. It is true as the cases show that a person otherwise occupied may become a dealer for the especial purpose of disposing of a particular property, and he may engage in the business in such a manner and to such an extent that even though his predominant motive is merely the liquidation of an asset, the profits gained are properly held to have been earned in the ordinary course of a trade or business; but we do not find that to be the situation in this case.

The judgment of the District Court is reversed and the case remanded with directions to enter judgment in favor of the taxpayer.

Reversed and Remanded.

1. Oliver v. Com'r, 4 Cir., 138 F.2d 910; Gruver v. Com'r, 4 Cir., 142 F.2d 363; Williamson v. Com'r, 4 Cir., 201 F.2d 564; Mauldin v. Com'r, 10 Cir., 195 F. 2d 714; Friend v. Com'r, 10 Cir., 198 F.2d 285; Ehrman v. Com'r, 9 Cir., 120 F.2d 607; Palos Verdes Corp. v. United States, 9 Cir., 201 F.2d 256, 259; Stockton Harbor Indus. Co. v. Com'r, 9 Cir., 216 F.2d 638.