R. L. HARCUM and Mary W. Harcum,
Plaintiffs,

v.

UNITED STATES of America,
Defendant.

Civ. A. No. 2410.

United States District Court
E. D. Virginia,
Norfolk Division.

May 9, 1958.

———◇———

Leroy T. Canoles, Jr., Paul M. Lipkin, Norfolk, Va., for plaintiffs.

L. S. Parsons, Jr., U. S. Atty., John M. Hollis, Asst. U. S. Atty., Norfolk, Va., for defendant.

WALTER E. HOFFMAN, District Judge.

Plaintiffs instituted this action to recover taxes paid under allegedly erroneous assessments for the years 1949, 1950, 1951 and 1952, in which it is contended by the taxing authority that (1) plaintiffs were engaged in the business of buying and selling real estate and hence are not entitled to compute their profits

from the sale of real estate on the basis of capital gains, and (2) a deposit under a lease as security for its performance is taxable as income during the year received. Plaintiff, Mary W. Harcum, is a housewife and a nominal party for the purpose of this proceeding. All reference to the plaintiff-taxpayer will be to R. L. Harcum.

█ Disposing of the security deposit, it is sufficient to state that by lease dated January 23, 1950, plaintiff and his co-owner received the sum of $1,000 as lessors of certain real estate; the pertinent provisions of said lease being contained in paragraph 16 as follows:

"The Lessee or Tenant has deposited with the Lessor and the Lessor acknowledges receipt of the sum of one thousand dollars ($1,000.00), which sum is to be considered a security deposit for the strict performance of all of the covenants and conditions of this lease; the said security deposit is to be held, controlled and disposed of on the following terms and conditions.

"If, before the expiration of the demised term, the lessee or tenant shall abandon or desert the premises, or if, during the said term, the lessee or tenant shall violate any of the terms, provisions or obligations of this lease, and if said violation shall not cease within ten (10) days after receipt of notice sent by ordinary mail to the address of the demised premises as shown herein, the interest of the lessee or tenant in the security deposit shall cease and determine and the lessor shall be entitled, without further action on its part, to retain same as liquidated damages, without prejudice to any of the other rights of the lessor under this lease.

"If the lessee or tenant shall not have forefeited the security deposit prior to September 30th, 1959, the same sum shall then be credited on the last three and a fraction months of the term.

"These provisions with reference to the security deposit shall continue in effect throughout the term and shall be binding to any successor to the title of lessor."

In Clinton Hotel Realty Corp. v. Commissioner, 5 Cir., 128 F.2d 968, the point in question was decided adversely to the Commissioner. The mere fact that the lessor is not required to hold the fund as a special deposit does not in itself destroy the character of the deposit as security. As it is conceded that the lessees have not defaulted under the terms of the lease, the amount received by the lessors is not taxable as income until such a default occurs, or until the last three and a fraction months of the term of the ten year lease. See, also, Warren Service Corp. v. Commissioner, 2 Cir., 110 F.2d 723; Clarkson Lindley Trust, 42 B.T.A. 509, affirmed 8 Cir., 120 F.2d 998; Estate of George E. Barker, 13 B.T.A. 562; John Mantell. 17 T.C. 1143; Bradford Hotel Operating Co., 26 T.C. 454. The fact that taxpayer operated on a cash, rather than on an accrual, basis does not lend support to defendant's position. In the absence of a default the lessors are obligated to credit the security deposit against rent during the last three months of 1959 and a fraction of the month of January, 1960.

This brings us to a consideration of plaintiff's profits from sales of real estate as ordinary income as contrasted with capital gains. In 1939, plaintiff acquired 84 acres of farm land in Princess Anne County for the sum of $5,500, which property he proceeded to clear for farming purposes. The acreage was shown on a plat recorded in 1893 indicating lots and blocks but never treated as such. There were a total of approximately 478 small 35-foot lots on the recorded plat. Plaintiff endeavored to farm the acreage and, in 1941, actually moved his residence to the property in question. Because of difficulties in securing farm labor, he abandoned his farming efforts in 1947 and moved to another locality. Before doing so, however, plain-

tiff constructed a barn, spread oyster shells on the farm roads, erected fences, graded the main road, and caused a sewer pipe to run to his farmhouse. These improvements, other than the barn, cost less than $2,000 during a period of ten years. During all of this time, as well as for the taxable years in question, plaintiff operated a profitable and substantial oil distributing business in the City of Norfolk, to which he devoted his entire time. Subsequent to the taxable years in controversy, plaintiff has retired, but we are not concerned with his present status.

The only purchases by taxpayer for the benefit of the subject property were in 1951 for the purpose of clearing title to his then owned real estate, which lots so acquired he believed that he already owned. Two dwelling houses were erected by the taxpayer in 1948 for two of his employees.

The pattern of sales reveals the following: in 1945 taxpayer made his first sales off the recorded plat, one sale being to a nephew and the other to an employee; thereafter a majority of the sales originated with the members of his family or employees, as plaintiff did not retain or secure the services of a real estate agent, nor did he solicit the sale of the lots; his efforts being limited to the erection of a sign which fell down a few months thereafter and was never replaced. Plaintiff did, however, restrict the size and price of houses to be constructed by purchasers, and endeavored to "spot" the houses being built by plaintiff's nephew. Sales subsequent to 1945 were as follows:

1946 - 9 sales covering 40 lots
1947 - 7 sales covering 32 lots
1948 - 12 sales covering 41 lots
1949 - 12 sales covering 31 lots
1950 - 9 sales covering 28 lots
1951 - 7 sales covering 21 lots
1952 - 20 sales covering 54 lots

These sales were reported by taxpayer as sales of capital assets. Plaintiff, in addition to his sales from the platted property in controversy, purchased and sold other properties in Tidewater, Virginia, but it is not contended that these other transactions should be treated as items of ordinary income.

■ Section 117(a) (1) of the Internal Revenue Code of 1939 (26 U.S.C.A., 1952 Ed., § 117) defines the term "capital assets" as follows:

> "The term 'capital assets' means property held by the taxpayer (whether or not connected with his trade or business), but does not include * * * stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business; * * *"

Thus the determinative question is whether the taxpayer held the lots during the taxable years in controversy "primarily for sale to customers in the ordinary course of his trade or business". The question must be answered in the negative.

The factual situation is substantially similar to Frieda E. J. Farley, 1946, 7 T.C. 198, in which the "frequency and continuity" test is discussed at length. Cases applying this test to real estate transactions involved elements of development and substantial sales activity, as contrasted with the passive posture role. The fact of gradual liquidation of an asset is frequently disregarded where the active elements of development and sales activities are absent.

■ The issue is, of course, essentially one of fact. D. L. Phillips, 24 T.C. 435. There are many tests, no single one decisive, which must be considered. Among them are (1) the frequency and continuity of sales, (2) the reason, purpose and intent for which the property was acquired and held, (3) the activity of the taxpayer, or his agent, in connection with real estate sales, (4) the nature and extent of taxpayer's business or vocation, (5) the extent of improve-

ments made to the property sold, (6) whether the property was held primarily for investment, (7) whether taxpayer devoted appreciable time, attention, and efforts to an additional "business" with substantial regularity tantamount to an occupational undertaking, and (8) the character and degree of supervision or control exercised by taxpayer over any representative employed or used to carry on taxpayer's activities.

The foregoing factors were adopted in Camp v. Murray, 4 Cir., 226 F.2d 931, wherein the court cites with approval the language in Smith v. Dunn, 5 Cir., 224 F.2d 353. In Camp, the taxpayer inherited 80 acres of land in 1926, and thereafter in 1938 acquired an additional 40 acres by purchase from his brother. Taxpayer was the vice-president in charge of production and personnel of a large paper mill which was the town's principal business. As the organization grew there was an increasing need for housing employees and others attracted to the town by the paper mill. In 1950, taxpayer sold 24 acres to his brother, and proceeded to cause the remaining 90 acres to be surveyed and platted at a cost of $2,143.66, water lines installed involving an expense of $20,841.80, and roads paved with an expenditure of $15,-189.02. These activities and improvements brought forth inquiries for home sites without solicitation by taxpayer who then turned over the business of selling lots to a realtor on a commission basis. Preference for lots was to be given to employees of the paper mill. The court held, in reversing the district court, that taxpayer's civic motive outweighed his desire for large profits, and the profits should be treated as capital gains as taxpayer devoted practically no time to the project. The Camp case is very nearly analogous to the facts in the instant proceeding. In fact, it may be safely said that there was far more justification to tax the Camp sales as ordinary income because of development factors, the subdividing and platting, and the extensive improvements made to cause the property to be more at-

tractive for residential sites. In the case at bar, it would appear that the Government relies almost entirely upon the factor of "frequency and continuity" of sales—a theory that has been materially refuted in Farley, supra, where it is said:

"In the absence of the elements of development and sales activity * * * we are not inclined to think the frequency and continuity test as applied to these circumstances would constitute, in and of itself, a satisfactory criterion of business activity."

Defendant relies upon Gruver v. Commissioner, 4 Cir., 142 F.2d 363; Oliver v. Commissioner, 4 Cir., 138 F.2d 910; Williamson v. Commissioner, 4 Cir., 201 F.2d 564; and Peebles v. Commissioner, 4 Cir., 249 F.2d 92. The authorities are readily distinguishable. In Gruver, the taxpayer was a real estate dealer who was merely advancing the argument that he was entitled to capital gains treatment because his land was traded or exchanged, rather than sold, where his customers were other real estate brokers. Again in Oliver, the taxpayer's principal occupation was that of dealing in real estate, although he was also a farmer. There it should be noted that the taxpayer engaged extensively in development and sales activity when he laid out and paved the streets, installed drainage pipes, platted the land, advertised by sign, sold on the installment basis, and, finally, reported *no* farm income during the taxable years in controversy.

It is true that in Williamson v. Commissioner, supra, the case of Rollingwood Corp. v. Commissioner, 9 Cir., 190 F.2d 263, 266, is cited with approval, and in Rollingwood the court said:

"While the purpose for which the property was acquired is of some weight the ultimate question is the purpose for which the property is held. * * *

"* * * The purpose [of the capital gains provision] is to protect 'investment property' as dis-

tinguished from 'stock in trade', or property bought and sold for a profit. It is our view that this policy was not meant to apply to a situation where one of the essential purposes in holding the property is sale."

If we were to apply literally the rule as quoted above, it would be next to impossible to accord capital gains treatment to the sale of real estate once the taxpayer has recaptured his original investment. Certainly this was not the intent of Congress. As was said in Home Company v. Commissioner, 10 Cir., 212 F.2d 637, 641:

"One may, of course, liquidate a capital asset. To do so it is necessary to sell. The sale may be conducted in the most advantageous manner to the seller and he will not lose the benefits of the capital gains provision of the statute, unless he enters the real estate business and carries on the sale in the manner in which such a business is ordinarily conducted."

The Williamson case applies the frequency and continuity test to profits on cotton purchased under "call" contracts by a gin operator from his own mill for the purpose of reselling it at a profit. The taxpayer's business was that of buying and selling cotton. It is indeed difficult to reconcile a commodities case with that involving the sale of real estate. Furthermore, the doctrine pronounced in Rollingwood Corp. v. Commissioner, supra, referred to in Williamson, is definitely modified by the subsequent decision in Camp v. Commissioner, supra.

The recent case of Peebles v. Commissioner, supra, affirming 15 T.C.M. 801 affords but little relief to the defendant. The taxpayer therein originally acquired the land for investment, but later changed his approach by holding the property primarily for sale in the ordinary course of business. In so doing taxpayer improved the property by adding railroad sidings and acquired nearby properties to enhance the desirability of property already purchased. The court pointed out that activity of this type on the part of the taxpayer points away from a passive liquidation of property, particularly when he commenced his sales on the very day of his later purchases. See, also, Lakin v. Commissioner, 4 Cir., 249 F.2d 781.

There has been general approval of the tests laid down in Smith v. Dunn, supra, and Farley, supra. In addition to Camp v. Murray, supra, decided by this Circuit, we find White v. Commissioner, 5 Cir., 172 F.2d 629; Curtis Co. v. Commissioner, 3 Cir., 232 F.2d 167; and Goldberg v. Commissioner, 5 Cir., 223 F.2d 709. If we exclude the "civic mindedness" feature of the taxpayer in Camp, we come to the conclusion that the present taxpayer (Harcum) is far more "passively postured".

A judgment order will be entered upon presentation.