Abe Pickus and Etta Pickus v. Commissioner.
Pickus v. Commissioner
Docket No. 90659.
United States Tax Court
T.C. Memo 1963-342; 1963 Tax Ct. Memo LEXIS 4; 22 T.C.M. (CCH) 1791; T.C.M. (RIA) 63342; December 30, 1963
*4 Held: Unimproved real estate purchased at tax-delinquency sales and held for substantial periods without development or sales activity was not held for sale to customers in the ordinary course of taxpayer's trade or business. Proper years to report certain income determined. Martin A. Rini, 830 Bulkley Bldg., Cleveland, Ohio, for the petitioners. Buckley D. Sowards for the respondent. TRAIN
Memorandum Findings of Fact and Opinion TRAIN, Judge: Respondent determined deficiencies in income tax and an addition to tax for the calendar years and in the amounts as follows: Addition to Tax
Sec. 294(d)(2)
Year
Deficiency
1939 Code
1949
$ 1,233.92
1950
6,438.20
1952
51,480.33
$3,304.27
1954
3,002.43
1955
3,738.62
1956
4,110.05
1957
14,060.63
1958
5,193.15
*5 In addition, an overassessment of $3,245.70 was determined for 1951. The issues for decision are stipulated to be as follows: (1) Whether the petitioners, doing business as A. & E. Pickus Company, a partnership, are in the business of selling real estate so that gain realized from the sale of land is ordinary income; (2) Whether a certain note and mortgage received from Nathan Staman should be included in petitioners' income for the year 1952; (3) The proper year for including the gain realized from the sale of the following property: (a) Sublot 122 known as the Gould lot; (b) Eighty-eight lots known as the Hathaway lots; (c) Seventeen lots known as East 141st Street lots; and (d) Sublot 89 Brunswick and Sublots 43, 44, 45 and 46 Rockside; (4) Whether income identified as "income from Robert Levin, trustee" was taxable to the petitioners as ordinary income or as capital gain; (5) Whether the income received by Mendotta, Inc., and Corkhill, Inc., should be attributed to the A. & E. Pickus Company, partnership; and (6) Whether petitioners are liable for the addition to tax under section 294(d)(2) for the year 1952. Other adjustments made by the respondent for *6 the years 1949, 1950, 1952, and 1954 through 1958, inclusive, are not contested by the petitioners. Findings of Fact Some of the facts have been stipulated and have been incorporated herein. Petitioners, Abe Pickus (sometimes hereinafter referred to as Abe) and Etta Pickus (sometimes hereinafter referred to as Etta), are husband and wife and reside in Shaker Heights, Ohio. For the calendar years 1949 through 1958, petitioners filed joint Federal income tax returns on the cash basis of accounting with the district director of internal revenue or his predecessor, the collector of internal revenue, Cleveland, Ohio. In January 1942, Abe and Etta formed a partnership known as A. & E. Pickus Company (hereinafter sometimes referred to as A&E). For the calendar years 1949 through 1958, partnership returns were filed with the district director of internal revenue or his predecessor, the collector of internal revenue, Cleveland, Ohio. A&E used an accrual basis of accounting. The partnership received the bulk of its income from various rental properties, management fees, and from the sales of land here involved. Abe carried on the daily business of the partnership while Etta kept the *7 records of cash transactions. Beginning in 1939 the Cuyahoga County auditor embarked upon a program of selling at forfeited land sales thousands of parcels of land after advertising the same for sale in the newspapers and after giving public notice that the parcels of land would be sold to the highest bidder. The following schedule shows the number of parcels advertised by the Cuyahoga Country auditor, the number of sales, the average tax assessment value, and the average successful bid price for the years 1939 through 1958: Average Tax
Assess-
Average
Parcels
ment
Successful
Year
Advertised
Sold
Value
Bid Price
1939
Unknown
539
$706.17
$137.66
1940
1,944
1,103
579.74
111.59
1941
5,623
1,420
455.45
72.22
1942
None
None
1943
None
None
1944
3,217
3,152
440.40
203.55
1945
3,397
3,050
456.22
433.15
1946
3,535
3,090
385.18
356.64
1947
6,552
4,432
404.23
189.30
1948
12,851
9,388
307.09
166.72
1949
13,737
9,588
274.67
161.25
1950
12,694
7,190
318.44
374.30
1951
None
None
1952
5,865
2,284
370.87
472.53
1953
1,842
781
337.34
475.60
1954
583
179
317.93
571.56
1955
161
72
390.27
555.69
1956
None
None
1957
None
None
1958
557
264
Unknown
Unknown
*8 Buyers at these sales received title free and clear of all encumbrances, including the abatement of any delinquent taxes and assessments. For the years 1944 and 1945 future assessments were also abated. Abe attended some of the sales and purchased lots and acreage for the partnership. In order to finance the partnership in these purchases petitioners sold stock and securities which they held, and a three-family house on Overlook Road in Cleveland Heights. The number of lots and acreage purchased by the petitioners as individuals prior to 1942 and as a partnership from 1942 through 1958 is as follows: Purchased
Undivided
Acre-
Fractional
Year
Lots
age
Interests
Lots
1940
9
1941
52
1
1942
2
6
1943
None
2
1944
None
1945
1/3 - 1 lot
5
1946
13
2
2
1947
231
22
1948
249
1
3/4 - 35 lots
22
1/2 - 149 lots
1/6 - 65 acres
1949
1/2 - Acreage
43
1950
85
1
1/5 - Acreage
35
1/7 - Acreage
1/2 - 10 lots
1/5 - 157 lots
1/2 - 1 lot
1/10 - 44 lots
1/5 - 226 lots
1/3 - 25 lots
1/2 - 1 lot
1/5 - Acreage
1951
14
1
1/5 - 1 lot
20
1952
28
1/3 - 52 lots
33
1/2 - 2 lots
1/2 - 185 lots
1/3 - 6 lots
1/2 - 2 lots
1953
14
1/2 - 2 lots
20
1/5 - 70 lots
1954
12
1/5 - Acreage
15
1/3 - 9 lots
1955
7
1/3 - Acreage
33
1/4 - Acreage
1956
1/5 - 2 lots
20
1957
None
18
1958
1
1/2 - 1 lot
17
1/6 - Acreage
*9 Sold
Undivided Fractional
Interest
Year
Acreage
Lots
Acreage
1940
1941
1942
1943
1944
1945
1946
1947
1948
1949
1/6 - acres
1950
2
1/3 - 1 lot
1/5 - Acreage
3/4 - 1 lot
1/7 - Acreage
1951
1
1952
1
1/2 - 163 lots
1953
1954
1/5 165 lots
1/3 - 61 lots
1955
1956
1957
1958
Exclusive of the transaction involving Sublot 122, known as the Gould lot, the partnership in 1949 sold 43 lots plus an undivided fractional interest in 65 acres on Northfield Road, in 7 transactions. Of the lots and acreage sold in 1949, 3 were purchased in 1941, 2 were purchased in 1947, 38 were purchased in 1948, and the fractional interest was purchased in 1949. The Gould lot, which was acquired in 1946, was sold in one transaction. The partnership reported the gain of $49.02 in 1950. Respondent determined that the gain should have been included in 1949. Exclusive of the Gould lot transaction, in 1950 the partnership sold 35 lots and 2 parcels of acreage plus their undivided fractional interest in 2 lots and undivided fractional interest in Rockside Road acreage, in 10 transactions. Of the lots sold, 7 were purchased *10 in 1941, an undivided fractional interest in one lot was purchased in 1945, 26 were purchased in 1947, an undivided fractional interest in one lot and one parcel was purchased in 1948, one parcel of acreage was purchased in 1949, and 2 lots and an undivided fractional interest in 2 parcels of acreage were purchased in 1950. Exclusive of the transaction involving the 88 lots known as Hathaway Road lots, the partnership in 1951 sold 20 lots and one parcel of acreage in 9 transactions. Of these lots and acreage sold in 1951, 5 lots were purchased in 1941, 1 parcel of acreage was purchased in 1946, 3 lots were purchased in 1947, and 12 lots were purchased in 1948. The partnership included in their income for the year 1951 the gain from the sale of the 88 lots known as Hathaway Road lots. The Commissioner determined that this gain should have been reported in the year 152. Of the 88 Hathaway Road lots, 57 1/2 were acquired in 1948 and 30 1/2 lots were acquired in 1950. On November 1, 1951, I. Gross, on behalf of the Aetna Construction Company, proposed to purchase from partnership 33 lots in the Hathaway Road Subdivision for $25,600. This offer was accepted and a down payment of $5,000 *11 was recorded on November 10, 1951, and an entry made on taxpayers' records to read "Deposit 33 lots on Hathaway." In the transaction an option was granted to the purchaser for an additional 69 lots on Hathaway Road and some time prior to December 31, 1951, the purchaser exercised this option and purchased an additional 55 of the 69 lots covered by the option. The original transaction involving the 33 lots was escrowed with the Lawyer's Title and Insurance Company on November 21, 1951, but since shortly thereafter the purchaser exercised his option to purchase the additional 55 lots, the original escrow was modified to include the 55 lots making a total of 88 lots and was redated to January 17, 1952. The deed to the property was executed on January 17, 1952, and recorded on January 30, 1952, with taxes being pro rated to January 17, 1952. Exclusive of transactions involving certain lots on East 141st Street in Maple Heights, Ohio, and the transactions set forth above involving the Hathaway Road lots, the partnership sold 33 lots, 1 parcel of acreage, plus its undivided 1/2 interest in 163 lots known as Sedgewick Road lots, in 9 transactions in the year 1952. Of the lots and acreage *12 sold, 1 parcel of acreage was purchased in 1946, 20 lots were purchased in 1947, 10 lots and an undivided fractional interest in 149 lots were purchased in 1948, 1 lot and an undivided fractional interest in 10 lots were purchased in 1950, and 2 lots and an undivided fractional interest in 4 lots were purchased in 1952. The partnership and Abe's nephew, Leonard Zill, sold 163 unimproved lots located on North Sedgewick and South Sedgewick Roads in Lyndhurst, Ohio, (referred to above as Sedgewick Road lots) to Nathan Staman (hereinafter sometimes referred to as Staman) on September 9, 1952. The partnership and Leonard Zill each owned an undivided 1/2 interest in these lots. The lots were sold in 1952 for $40,000 cash and a note in the amount of $57,800 which was secured by a mortgage on the lots sold, 149 of these lots had been acquired at the county auditor's sale in June 1948, 10 additional lots were acquired in 1950, and 4 additional lots were acquired in 1952 to fill out the parcel. During 1953 and 1954 the mortgage and note received in the Sedgewick Road transaction were valueless. Comparable lots in the same area were being sold for $800 to $900 each, with improvements. The *13 cost of improving the Sedgewick Road lots by installing storm and sanitary sewers and pavement would have been approximately $1,500 to $1,600 per lot. Staman, the purchaser, was unable to obtain the financing necessary to develop these lots. He was unable to pay the current taxes, which totaled $25,366, and the partnership and Leonard Zill received payment in 1954 only because a large real estate developer in the city decided to purchase Staman's interest. Only $32,434 of the $57,800 mortgage was received because delinquent taxes were paid from the gross amount. In 1952 A&E owned 17 lots on East 141st Street, Maple Heights, Ohio. On July 16, 1952, A&E transferred these lots to the Montagner Building Corporation, the shareholders of which are Anthony Montagner - 37 1/2 percent, Abe - 37 1/2 percent, and Ben Woolf - 25 percent. On August 14, 1952, A&E entered into an agreement with the Montagner Building Corporation which provided, in part: It is agreed between A. Pickus and Montagner Building Corporation, Anthony A. Montagner, President, that A. Pickus will receive $900.00 each for the following seventeen sublots * * * as the houses are sold and transactions closed out of escrow. *14 The partnership reported the gain on this sale in the year in which homes were built and sold by the corporation, 1953. The respondent determined that the gain should have been reported in the year 1952. In 1950 the partnership and others purchased the assets of the defunct Guardian Trust Company, which assets consisted of miscellaneous notes, mortgages, and real estate. This group decided to sell a block of these assets and the partnerships, together with Robert Levin, A. Levin and Leo Ascherman entered into an agreement whereby they would purchase these assets and designate Robert Levin as trustee. On May 24, 1951, Robert Levin, trustee, purchased these assets from the original group. In 1952 the partnership received $985.50, as its share of the gain in that year, from the sale of part of these assets by Robert Levin, trustee. These assets were not held by the partnership primarily for sale to customers in the ordinary course of its trade or business. Exclusive of the 17 lots known as East 141st Street lots (referred to above), Sublot 89 Brunswick and Sublots 43, 44, 45 and 46 Rockside, the partnership in 1953 sold 20 lots in 5 transactions. Of the lots sold, 3 were purchased *15 in 1941, 8 were purchased in 1947, and 9 were purchased in 1948. The respondent determined that the gain realized on the sale of Sublot 89 Brunswick and Sublots 43, 44, 45 and 46 Rockside which were all acquired in 1948 should have been reported in the year 1953 rather than in the year 1954. The Brunswick lot was sold to the R. & N. Building Company; the date of the deed was March 18, 1953. The Rockside lots were sold to the Prompt Building Corporation, a corporation controlled by the Pickus family. The date of the deed was August 28, 1953. Payment for these lots was received and reported by the partnership in 1954. Exclusive of Sublot 89 Brunswick and Sublots 43, 44, 45 and 46 Rockside, the partnership in 1954 sold 15 lots, plus an undivided fractional interest in 226 lots in 6 transactions. Of those lots sold, 2 were purchased in 1940, 1 was purchased in 1946, 1 was purchased in 1947, 2 were purchased in 1948, 7 lots and an undivided fractional interest in 165 lots were purchased in 1950, 1 lot was purchased in 1951, 1 lot and an undivided fractional interest in 52 lots were purchased in 1952, and an undivided fractional interest in 9 lots was purchased in 1954. In 1955 the *16 partnership sold 33 lots in 4 transactions. Of the lots sold in 1955, 1 was purchased in 1940, 3 were purchased in 1946, 12 were purchased in 1947, 10 were purchased in 1948, 5 were purchased in 1950, and 2 were purchased in 1954. In 1956 the partnership sold 20 lots in 2 transactions. Of the lots sold in 1956, 2 were purchased in 1946, 5 were purchased in 1947, 2 were purchased in 1948 and 11 were purchased in 1950. In 1957 the partnership sold 18 lots in 3 transactions. Of the lots sold in 1957, 3 were purchased in 1946, 1 was purchased in 1947, 2 were purchased in 1950, 4 were purchased in 1953, 1 was purchased in 1954, and 7 were purchased in 1955. In 1958 the partnership sold 17 lots in 7 transactions. Of the lots sold, 5 were purchased in 1941, 2 were purchased in 1947, 1 was purchased in 1950, 5 were purchased in 1951 and 4 were purchased in 1954. The partnership began purchasing tax-delinquent properties in 1940. From 1940 to 1958 it purchased a total of 717 lots. During the years involved here (1949-1958) the partnership sold 365 lots in 64 transactions, and still held 292 lots as of 1959. Of the 292 lots still held, 225 1/2 had been held for more than ten years. Of *17 the 254 lots sold, and for which the year of sale is not in dispute, 131 had been held for over five years. Abe was born in 1891. From 1929 through 1946 he was in the oil and steel tank businesses. He owned and operated a gas station, had bulk stations, and distributed Mobile oils and gasoline. He also bought and sold steel storage tanks and bought, dismantled and sold bulk plants and other related equipment. This required considerable traveling through Michigan, Illinois, Indiana and New York. During the years here in issue the partnership was engaged in managing several income-producing properties. The partnership income from sources other than sales of real estate averaged over eleven thousand dollars per year, and was sufficient to defray the expenses of petitioners and their family. Very few of the lots purchased by the partnership were improved with either sewer lines or sidewalks. The partnership did not improve any of the property purchased by it in any way, nor did it subdivide any of the property purchased by it. Petitioners have never been licensed either as real estate brokers or as real estate agents. The partnership never advertised any of its property for sale *18 nor placed any "For Sale" signs on the property. It never solicited anyone to purchase any lots or land and none of the sales resulted from solicitation by it. Many of the sales were made in the face of petitioners' reluctance and only upon the urging of others. Mendotta, Inc., and Corkhill, Inc., were incorporated on July 17, 1956. The corporate purposes of each were declared to be in part: To acquire, buy, purchase, lease, exchange or otherwise to own, hold, use, manage, develop, plat, improve, mortgage and to sell, lease, mortgage, exchange and otherwise deal in real estate, personal property, or mixed property and any interest or right therein either for its gain or for the gain of others; to own, erect, construct, repair, rebuild, manage and control, lease, buy and sell houses, apartments, offices, warehouses, and any and all other types of buildings and structures; to make and obtain loans on real estate and to secure, buy, sell, hold, own and otherwise deal in mortgages, mortgage bonds or notes, land contracts, land trust certificates, leases and any other evidences of indebtedness secured by real estate and to buy, sell, deal in, lease, mortgage, manufacture and produce *19 any and all personal property of every kind and description which may render profitable any of this company's dealings in or ownership of property or rights all to the same extent as natural persons might or could do merely as principles, agents, contractors or otherwise alone or in company with others and to do any or all other things instant and necessary thereto. All of the outstanding stock of each of these two corporations was issued to Abe in exchange for real estate lots. The board of directors of each of these two corporations is composed of Abe, Etta, Elaine Marks (petitioners' daughter), Sheldon Pickus (petitioners' son), and Robert Schultz. In each case, the officers are Abe, Etta, Elaine Marks, and Sheldon Pickus. Mendotta, Inc., and Corkhill, Inc., filed their Federal income tax returns on a fiscal year basis ending November 30. For the fiscal years 1957 and 1958 the net income realized from the sale of real estate lots was reported on their respective corporation income tax returns as follows: FY
Net Income
Ending
Realized
Mendotta, Inc.
11-30-57
$13,677.78
11-30-58
526.53
Corkhill, Inc.
11-30-57
12,606.91
11-30-58
229.81
*20 Opinion Issue 1 The issue is whether the amounts received in the taxable years 1949 through 1958 representing gains from the sale of lots and acreage constituted ordinary income as determined by respondent, or long-term capital gain as contended by petitioners. The answer depends upon whether the properties were "held by the taxpayer primarily for sale to customers in the ordinary course of [their] trade or business," so as to not be capital assets under sections 117(a)(1) of the 1939 Code and 1221(1) of the 1954 Code. On their returns for the years in question, the partnership treated its sales of real estate as sales of capital assets held for more than six months and reported the gain therefrom as long-term capital gain. We find that the properties whose sale is here involved were acquired and held by the partnership as investments and were not held primarily for sale to customers in the course of its trade or business. The question presented is essentially one of fact. D. L. Phillips, 24 T.C. 435 (1955). The many cases that turn on this issue have set forth certain factors to be considered; however, no single one is decisive. See and compare William E. Starke, 35 T.C. 18 (1960), *21 and its reversal, 312 F. 2d 608 (1963). As collected in Harcum v. United States, 164 F. Supp. 650 (E.D. Va., 1958) at 652, some of these factors are: (1) the frequency and continuity of sales, (2) the reason, purpose and intent for which the property was acquired and held, (3) the activity of the taxpayer, or his agent, in connection with real estate sales, (4) the nature and extent of the taxpayer's business or vocation, (5) the extent of improvements made to the property sold, (6) whether the property was held primarily for investment, (7) whether the taxpayer devoted appreciable time, attention, and efforts to additional "business" with substantial regularity tantamount to an occupational undertaking, and (8) the character and degree of supervision or control exercised by taxpayer over any representative employed or used to carry on taxpayer's activities. We shall consider each of these factors in relation to the facts of the instant case. In the ten years under consideration, 1949 through 1958, the partnership made 64 sales, or an average of 6.4 per year. *22 The number of sales in any given year ranged from as few as three to as many as ten. On this record, we believe that there was a lack of frequency and continuity in these sales. The partnership did not solicit purchasers and sales were made as a matter of chance, when a purchaser approached the petitioners with an attractive offer, rather than as part of any pattern. The uncontradicted testimony of Abe and Etta was that the property purchased at the tax sales was acquired and held as a long-term investment. This testimony is borne out by the evidence. As of 1959, the partnership held 40 percent of all the properties it had purchased, 75 percent of which it had held for more than ten years. Of the lots sold during the years in question, and for which the year of sale was not in dispute, the majority were held for more than five years. The length of time that the properties were held distinguishes the instant situation from the usual short-term real estate dealer's situation, and is strong support for petitioners' contention that these were long-term investments. Merchants National Bank of Mobile, 14 T.C. 1375 (1950), affd. 199 F. 2d 657 (C.A. 5, *23 1952); Palos Verdes Corp. v. United States, 201 F. 2d 256 (C.A. 9, 1952). The partnership's sole activity with regard to acquiring the property in question was Abe's appearance at tax sales to purchase it. Very few of the lots were improved and the partnership made no attempt to make any improvements. Petitioners were not real estate brokers. The property was never advertised for sale in any way. The partnership merely accepted satisfactory offers from unsolicited purchasers. The partnership, like the taxpayer in Frieda E. J. Farley, 7 T.C. 198 (1946), could have maintained a more passive role only by refusing to sell at all. Cf. Joseph M. Philbin, 26 T.C. 1159 (1956); C. E. Mauldin, 16 T.C. 698 (1951), affd. 195 F. 2d 714 (C.A. 10, 1952). During the years in question Abe was from 58 to 67 years of age. From 1929 to 1946 he devoted his time to various aspects of the oil and tank businesses, and the operation of a gas station and was the distributor of Mobile oil and gas. He also bought and sold steel storage tanks and bought, dismantled and sold bulk plants and other related equipment. This required considerable *24 traveling. In addition, the partnership through Abe was engaged during all the years in question in managing income-producing property. As we have heretofore stated, the partnership made no improvements to the property sold, despite the fact that very little of the property was improved and that the property was held for substantial lengths of time. Cf. Arthur E. Wood, 25 T.C. 468 (1955). From all the evidence, we are satisfied that the properties in question were held primarily for investment. The properties were purchased as an investment with the hope and expectation that they would appreciate in value. It is to be noted that the partnership did not rent any of the properties in order to derive current income. Cf. The Municipal Bond Corporation, 41 T.C. - (October 1, 1963). Nor did it engage in short-term sales to achieve a quick turnover and fast profit. The partnership held the properties hoping to benefit from the development of the Cleveland area after World War II. By purchasing when the price was low, and reselling when land would be in greater demand, petitioners believed that the value of their investments would appreciate due to improved economic conditions. *25 Petitioners devoted a great deal of time to their other activities. These included the management of rental property and the operation of oil, tank, and gasoline businesses. Although this does not negate the possibility that their real estate dealings could constitute an additional "business," when coupled with petitioners' lack of "busyness" in their real estate dealings, it is a factor to be accorded some weight. See Snell v. Commissioner, 97 F. 2d 891 (C.A. 5, 1938), affirming a Memorandum Opinion of this Court. The partnership hired no employees to carry on its investment in real estate. What little activity there was petitioners performed themselves. Cf. Snell v. Commissioner, supra. After examining the facts of this case in the light of the various tests laid down by the courts, we are persuaded that the partnership was not in the trade or business of selling real estate and have so found. To find otherwise would be to give controlling weight to one factor only, namely, the number of lots sold and to ignore the overwhelming evidence of other factors substantially all of which point to an investment operation, particularly the length of holding *26 periods involved, the failure to improve the properties, the lack of sales activity, and the reinvestment of proceeds from sale of other investments to finance these purchases. Seen in the light of this evidence, the number of lots sold and bought here becomes not an indicium of a trade or business but rather of an actively managed investment position. Although the issue is not free from some doubt, we hold that the lots and other parcels sold by the partnership during the years in question were held as capital assets and that petitioners are entitled to treat the gain therefrom as capital gain. Issue 2 On September 9, 1952, the partnership and Leonard Zill conveyed 163 lots on Sedgewick Road to Staman. They received $40,000 in cash and a note in the amount of $57,800, secured by a mortgage on the property. The note was paid in full in 1954. Petitioners contend that the note was valueless when received and that therefore the proceeds of the note were not includable in income until 1954 when they were actually received. Respondent contends that the note had a fair market value equal to its face and therefore it should be included in income in 1952. We agree with petitioners. *27 Respondent's argument that the note had a fair market value equal to its base is based primarily on the fact that there was a sale, that there was a stated security for the note, and that the note was paid in less than two years. Respondent argues that the alleged non-collectibility is controverted by the petitioners' acceptance of the note "as partial payment for valuable property." We believe the evidence fairly supports petitioners' position. The lots in question were unimproved. In 1952 and 1953 lots comparable to the ones on Sedgewick Road were selling for $800 to $900 each, fully improved. The cost of improving a lot was approximately $1,500. In addition, delinquent taxes on the property amounted to $25,366. Under the circumstances, it seems reasonable that the partnership would be willing to sell the property for a substantial down payment and take a promissory note for the remaining amount even if there were doubt as to the note's collectibility. Although the partnership held a mortgage on the lots to secure the $57,800 due on the property, they had serious doubt at the time the sale was made as to whether the lots were even worth as much as the $25,366 of delinquent taxes. *28 Thus the note and mortgage held by the partnership had no actual value. Collectibility of the note was never made certain until 1954, when Staman's interest was purchased by Forest City Enterprises. On the basis of the evidence presented, we hold that the Staman note had no fair market value in 1952 and that petitioners properly reported income therefrom in 1954. Issue 3 The issue is the proper year for including the gain from certain properties. (a) Gould lot. Petitioners introduced no evidence to refute respondent's determination that the gain from the lot should have been included in petitioners' income in 1949. Accordingly, respondent's determination is sustained. (b) Hathaway lots. Respondent contends that the income from the sale of the Hathaway lots should have been reported in 1952 rather than 1951. Respondent contends that the right to receive the income did not accrue until the title of the property passed, and points out that this did not occur until January 17, 1952, when the transaction was closed out of escrow. Petitioners contend that the income should be included in 1951. Petitioners point out that under Ohio law, the vendor of land is entitled to specific *29 performance of his contract of sale even though the only relief he seeks is the payment of money. Petitioners contend there was no uncertainty as to their right to receive the money, that the validity of their title was a mere formality, and that there was no question as to the purchasers' ability to pay. Thus, petitioners contend that the partnership's right to receive the money became fixed in 1951 and accrued in that year. We agree with petitioners. The passage of title was only a formality. Under Ohio law the partnership could have gotten specific performance of the contract so that all the burdens and benefits of the property passed in 1951. Forro v. Buckeye Realty of Cleveland, 34 O. App. 299 (1929); Wade v. Shahan, 26 ONP NS 567 (1927), and see cases collected in 49 O. Jur. 2d., Specific Performance, section 56, page 571. Thus, 1951 is the year in which A&E's right to the income became fixed, and in which it is to be reported. Ted F. Merrill, 40 T.C. 66 (1963), on appeal (C.A. 9, October 21, 1963). (c) East 141st Street lots. On July 16, 1952, A&E transferred 17 lots to the Montagner Building Corporation. Subsequently, on August 14, 1952, these *30 parties entered into an agreement whereby A&E was to receive payment as houses to be built thereon were sold and the transactions closed out of escrow. Respondent contends that under the accrual method of accounting income accrues when the taxpayers' right to receive it becomes fixed although payment may be postponed until a later date when the debtors' situation improves, citing Clarence Schock, 1 B.T.A. 528 (1925). Here, respondent contends, the right became fixed on July 16, 1952, when the property was sold by A&E, a partnership on the accrual method. Therefore, respondent concludes that the income should have been reported in 1952, the year of the sale. Petitioners contend that there could be no accrual in 1952 because the partnership's right to receive the income was dependent upon a condition not certain or probable to occur. Petitioners argue that the contract did not provide for payment until the company completed and sold certain houses. Petitioners conclude that no gain was reportable until 1953 when the uncertainty was ended by the construction and sale of the houses and lots. We agree with respondent. The property was in fact sold on July 16, 1952, and *31 it was at that time that the partnership's right to the income became fixed. The fact that A&E subsequently entered into an agreement to defer payment cannot change this result. Under the accrual method of accounting, it is when the right to the income became fixed, not when it was received, that is the critical inquiry. Spring City Co. v. Commissioner, 292 U.S. 182 (1934). (d) Sublot 89 Brunswick and Sublots 43, 44, 45 and 46 Rockside. On brief, petitioners concede that the income from these lots should have been reported in 1953 as determined by respondent. Accordingly, respondent's determination is sustained. Issue 4 In 1950 Abe and others purchased the assets of the Guardian Trust Company. These assets consisted of miscellaneous notes, mortgages, and real estate. This group decided to sell a block of these assets and designated Robert Levin as trustee. On May 24, 1951, Robert Levin, trustee, purchased these assets from the original group. In 1952, Abe received $985.50 as his share of the gain from the sale of part of the assets. The issue is whether the gain is taxable *32 as capital gain as contended by petitioners or as ordinary income as determined by respondent. We agree with petitioners. Petitioners' gain was from the sale of capital assets under section 117(a)(1) of the 1939 Code held for more than six months, and they are entitled to long-term capital gains treatment. Petitioners were not in the business of selling real estate nor were they in the business of liquidating trust companies. Issue 5 The issue is whether the income received by Mendotta, Inc., and Corkhill, Inc., for the years 1957 and 1958 should be attributed to A&E as contended by respondent or whether the income should be taxed to the corporations as contended by petitioners. To support his position, respondent contends that Mendotta, Inc., and Corkhill, Inc., were created for the purpose of selling real estate. Respondent points out that all the outstanding stock was issued to Abe in exchange for real estate, that the corporations used the same offices and conducted their business on the same premises as A&E, and that there were no employees other than Abe and Etta. Respondent contends that under similar circumstances this Court has found that there was only one taxable *33 entity, citing Advance Machinery Exch. v. Commissioner, 196 F. 2d 1006 (C.A. 2, 1952), affirming a Memorandum Opinion of this Court and Shaw Construction Co., 35 T.C. 1102 (1961). Respondent also contends that there was no business purpose for organizing the two corporations to conduct the same type business as A&E. Petitioners contend that there is no reason to ignore the separate existence of the corporations because they were formed for the legitimate business purpose of constructing houses. We agree with petitioners. Mendotta, Inc., and Corkhill, Inc., were incorporated to provide limited liability for any construction activity in which petitioners might have wauted to engage. The fact that no houses were ever built by the corporations does not warrant a disregard of the corporate entities. The activities of the corporations were within the scope of their corporate purposes, and they are entitled to be recognized as entities separate from the partnership and to be taxed as such. Moline Properties v. Commissioner, 319 U.S. 436 (1943); Jackson v. Commissioner, 233 F. 2d 289 (C.A. 2, 1956); National Carbide Corp. v. Commissioner, 336 U.S. 422 (1949); *34 Hagist Ranch, Incorporated v. Commissioner, 295 F. 2d 351 (C.A. 7, 1961). The cases relied on by respondent are not in point. In Advance Machinery Exch. v. Commissioner, supra, the taxpayer operated two corporations and two partnerships with total disregard for their individuality, so they could be manipulated to reduce their tax liability. One of the corporations was shown to have made 47 sales in the last of 1942 for tax purposes, although in fact it was totally inactive. Even so, the corporate entities were not disregarded, but there was a reallocation to the entities actually earning the income under section 45 of the 1939 Code. In Shaw Construction Co., supra, the taxpayers formed 88 corporations which we found to be shams. The corporations were formed only to reduce the taxes of the parent corporation. All building activity was carried out by the parent which produced the income and disposed of it. Since Mendotta and Corkhill were formed for legitimate business purposes, respondent's determination was erroueous, and the income in question is taxable to the corporations, not to the partnership. Issue 6 Petitioners' liability, if any, for additions *35 to tax under section 294(d)(2) of the 1939 Code, will be determined in the Rule 50 computation. Decision will be entered under Rule 50.