William Q. **BOYCE**, Individually and as Executor of the Will and Estate of Ida Mae Boyce, Deceased

v.

The **UNITED STATES**.

No. 370–66.

United States Court of Claims.

Decided Dec. 13, 1968.

William Q. Boyce, pro se.

E. Alan Moorhouse, Washington, D. C., with whom was Asst. Atty. Gen. Mitchell Rogovin, for defendant, Philip R. Miller, Joseph Kovner and Mason C. Lewis, Washington, D. C., of counsel.

Before LARAMORE, Acting Chief Judge, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

* The concurring opinion of LARAMORE, Judge, in which DURFEE, Judge, and DAVIS, Judge, join, and the dissenting opinion of SKELTON, Judge, in which

## OPINION

### PER CURIAM:

This case was referred to Trial Commissioner Mastin G. White with directions to make findings of fact and recommendation for conclusions of law under the order of reference and Rule 57 (a). The commissioner has done so in an opinion and report filed on February 8, 1968. Exceptions to the commissioner's opinion, findings and recommended conclusion of law were filed by plaintiff and the case has been submitted to the court on oral argument of plaintiff, pro se, and of counsel for defendant and the briefs of the parties. The major issue in this case is governed by the "claim of right" doctrine which "is now deeply rooted in the federal tax system." United States v. Lewis, 340 U.S. 590, 592, 71 S. Ct. 522, 523, 95 L.Ed. 560 (1951). See also Healy v. Commissioner of Internal Revenue, 345 U.S. 278, 73 S.Ct. 671, 97 L.Ed. 1007 (1953), and James v. United States, 366 U.S. 213, 216, 219, 238, 256–257, 81 S.Ct. 1052, 6 L.Ed.2d 246 (1961). Since the court agrees with the commissioner's opinion, findings and recommended conclusion of law, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case.* Therefore, plaintiff is not entitled to recover and the petition is dismissed.

### OPINION OF COMMISSIONER

#### WHITE, Commissioner:

The petition in this case asserts that the plaintiff is seeking refunds of income taxes paid by him pursuant to deficiency assessments for the years 1959, 1961, and 1962.

■ The petition and the evidence in the record indicate that the deficiencies for 1961 and 1962 were assessed because of a holding by the Internal Revenue Service that hotel expenses for lodging and food which the plaintiff and his wife

COLLINS, Judge, concurs, follow the opinion of the trial commissioner which has been adopted by the court.

(who is now deceased) incurred during 1961 and 1962 incident to the diagnosis and treatment of an illness from which the plaintiff was suffering at the time did not constitute deductible expenses, as claimed by the plaintiff and his wife in their joint income tax returns for 1961 and 1962. However, in the brief which the plaintiff filed subsequent to the trial, the plaintiff states that "The claim that Plaintiff's deductions for hotel food and lodging expenses for the years 1961 and 1962 were improperly disallowed is abandoned." Accordingly, it is unnecessary to discuss the claims asserted in the petition with respect to the years 1961 and 1962.

The claim relative to the year 1959 presents for determination the primary question of whether the gains realized by the plaintiff in connection with the disposition of two parcels of land were taxable in 1959, as determined by the Internal Revenue Service when it issued the deficiency assessment for 1959, or in 1964, as contended by the plaintiff.

It is my opinion that the gains mentioned in the preceding paragraph were taxable in 1959, and, accordingly, that the Internal Revenue Service did not commit any error with respect to this point.

In 1959, the State of Texas filed two suits in a state court against the plaintiff for the condemnation of two parcels of land situated in Potter County, Texas. One of the parcels contained 9.984 acres, and the other parcel contained 3.75 acres. The State of Texas wished to acquire the property for highway purposes.

In accordance with state court procedure, the suits were heard before commissioners, who, on April 1, 1959, awarded the plaintiff a total of $34,335, of which the sum of $24,960 was attributable to the larger parcel of land and the sum of $9,375 was attributable to the smaller parcel of land. The sum of $24,960 for the larger parcel included a net increase of $18,439.38 above the cost of this parcel to the plaintiff, and the sum of $9,375 for the smaller parcel included a net increase of $8,924.74 above the cost of such parcel to the plaintiff.

The State of Texas was dissatisfied with the awards made by the commissioners, and took appeals to the County Court of Potter County, Texas.

While the appeals were pending before the County Court of Potter County, the State of Texas took possession of the property on June 2, 1959. On the same date, the State, in accordance with the provisions of Article 3268 of the Vernon's Ann.Revised Civil Statutes of Texas, deposited the amounts of the awards, totaling $34,335, with the clerk of the County Court of Potter County.

The deposit mentioned in the preceding paragraph was subject to the order of the plaintiff; and a few days after the deposit was made by the State of Texas, the funds were withdrawn by the plaintiff.

Judgments on the appeals from the commissioners' awards were not entered by the County Court of Potter County until December 27, 1963, at which time the awards previously made by the commissioners were affirmed. The time for taking appeals from these judgments to a higher court did not expire until January 1964, and, accordingly, the judgments did not become final until 1964.

The joint income tax return which the plaintiff and his wife filed with the Internal Revenue Service for the year 1959 on the cash basis of accounting did not report any gains derived from the disposition of the two parcels of land previously mentioned. However, when this return was audited by the Internal Revenue Service early in 1964, a deficiency was assessed in the amount of $8,895.33 (consisting of $6,984.31 as principal and $1,911.02 as interest) on the ground that the gains realized by the plaintiff in connection with the disposition of such property were taxable in 1959. The deficiency was paid by the plaintiff on November 10, 1964.

Thereafter, a claim for the refund of the deficiency assessment mentioned in the preceding paragraph was filed by the

plaintiff with the Internal Revenue Service on June 24, 1965. The claim was formally disallowed on December 21, 1965.

The present suit was filed by the plaintiff on October 24, 1966.

The plaintiff contended before the Internal Revenue Service, and he asserts here, that the gains realized from the condemnation of the two parcels of land were taxable in 1964, rather than in 1959.

■ With respect to a taxpayer, such as the plaintiff, who is on the cash basis of accounting, Section 451(a) of the Internal Revenue Code of 1954 provides that income shall be included in the return "for the taxable year in which received by the taxpayer * * *." In my opinion, the income from the disposition of the two parcels of land condemned by the State of Texas and involved in the present litigation was "received" by the plaintiff in June 1959, when he withdrew the $34,335 from the County Court of Potter County, Texas. The statutory provision (Article 3268 of the Revised Civil Statutes of Texas) under which the State of Texas deposited the money with—and the plaintiff withdrew it from—the County Court of Potter County did not impose upon the plaintiff any restriction whatever concerning the disposition of the funds; and thereafter, while awaiting the decision of the County Court of Potter County on the appeals from the commissioners' awards, the plaintiff proceeded to utilize portions of such funds from time to time for the building of fences on a farm near Denton, Texas, automobile taxes, telegrams, accounting services, insurance, investments, and other personal purposes.

It is true that, as pointed out by the plaintiff, the withdrawal of the $34,335 from the County Court of Potter County was subject to the declaration in Article 3268 of the Revised Civil Statutes of Texas that "in any case where the award paid the defendant [i. e., the present plaintiff] or appropriated by him exceeds the value of the property as determined by the final judgment, the court shall adjudge the excess to be returned to the plaintiff [i. e., the State of Texas]." It actually happened in the present instance that the County Court of Potter County ultimately affirmed the awards which the commissioners had made to the plaintiff in connection with the condemnation of his lands by the State of Texas. However, up until the time when the court finally acted, there was a possibility that the court might decide that the amount awarded to the plaintiff by the commissioners was excessive, and order the plaintiff to return the excess to the State of Texas. This possibility, in my opinion, was not sufficient to affect the conclusion that the plaintiff "received" the money for his lands in June 1959, when he withdrew the $34,335 from the County Court of Potter County without any restriction as to the disposition of the money.

The problem in this case is very similar to the problem that was involved in North American Oil Consolidated v. Burnet, 286 U.S. 417, 52 S.Ct. 613, 76 L.Ed. 1197 (1932). The background for that litigation really began to develop when a controversy arose between the United States and North American sometime prior to 1916 over the ownership of a certain section of oil-producing land. The Government instituted a suit in a United States District Court against North American to oust the company from the possession of the land; and on February 2, 1916, the Government secured the appointment of a receiver to operate the property and to hold the net income from it. In 1917, the District Court rendered a decision favorable to North American, whereupon the receiver paid over to the company the profits that had been earned from the property in 1916 during the receivership. The Government took an appeal (without supersedeas) to a Circuit Court of Appeals, which affirmed the decree of the District Court. The Government then took a further appeal to the Supreme Court, but this appeal was subsequently

dismissed in 1922 by stipulation of the parties.

As an outgrowth of the incidents summarized in the preceding paragraph, a dispute developed between North American and the Internal Revenue Service over the question of the year in which the profits that the receiver turned over to North American were taxable. The Internal Revenue Service contended that such income was taxable in 1917, when the profits were paid over to North American by the receiver, whereas North American contended in the alternative that the profits were taxable either in 1916, when they were earned, or in 1922, when the litigation over the ownership of the income-producing property was finally terminated in North American's favor. This dispute eventually reached the Supreme Court.

In its decision, the Court held that the profits in question constituted income of North American in 1917, when the company actually received the money, notwithstanding the circumstance that the controversy over the ownership of the income-producing property was still pending before a higher court on appeal and might ultimately have been decided against North American. The Court stated (286 U.S. at page 424, 52 S.Ct. at 615) that:

> * * * If a taxpayer receives earnings under a claim of right and without restriction as to its disposition, he has received income which he is required to return, even though it may still be claimed that he is not entitled to retain the money, and even though he may still be adjudged liable to restore its equivalent. * * *

The ruling by the Supreme Court in the *North American* case is clearly applicable to the present case.

The plaintiff relies upon the case of Patrick McGuirl, Inc. v. Commissioner of Internal Revenue, 74 F.2d 729 (2d Cir. 1935), cert. denied, 295 U.S. 748, 55 S.Ct. 827, 79 L.Ed. 1693 (1935), but the reliance is misplaced. In *McGuirl*, some realty belonging to the taxpayer was taken by the City of New York under the power of eminent domain on December 1, 1926, but the taxpayer continued to occupy the premises as a month-to-month tenant until October 31, 1927. No award of compensation was made to the taxpayer until May 31, 1928, when the award was tentatively fixed at $132,-000. The taxpayer contested the amount of the tentative award; and by a final decree of a state court dated April 12, 1929, the amount was fixed at $131,998, together with interest from December 1, 1926. The taxpayer received the award, including interest, on July 8, 1929.

A controversy arose between the taxpayer, which kept its books and filed its income tax returns on the accrual basis of accounting, and the Internal Revenue Service over the question of whether the gain from the disposition of the property was taxable in 1926, as contended by the taxpayer, or in 1929, as contended by the Internal Revenue Service. This controversy was finally decided by the Circuit Court of Appeals for the Second Circuit, which upheld the position of the Internal Revenue Service that the gain did not accrue to the taxpayer until 1929. The court said (74 F.2d at page 730) that although the obligation to pay arose in 1926, the taxpayer's gain could not have been estimated in 1926 with any degree of accuracy because "the amount of award depended upon the course of future events" and there was no assurance that there would be any gain.

Thus, the court held in the *McGuirl* case that the gain from the condemnation of the property did not accrue to the accrual-basis taxpayer until 1929, the year when the litigation over the amount of the award was finally terminated and the taxpayer received the award. That decision fails to provide support for the contention by the present plaintiff, a cash-basis taxpayer, that the gains from the condemnation of his lands were not "received" by him in 1959, the year when the proceeds from the condemnation of the lands were actually paid over to the plaintiff.

It is my opinion, therefore, that the gains which the plaintiff realized from the condemnation of the two parcels of land previously mentioned were taxable in 1959, as determined by the Internal Revenue Service.

In addition to the primary question discussed in the preceding part of this opinion, the present case also presents for determination a secondary question as to whether the Internal Revenue Service committed error when the agency refused to grant the plaintiff an extension of time for the replacement of the property that was taken by the State of Texas.

In connection with this subsidiary question, Section 1033 of the Internal Revenue Code of 1954 provides in pertinent part that if property is condemned or is otherwise involuntarily converted into money, and the taxpayer, during the period beginning with the date of the disposition of the converted property and ending "(i) one year after the close of the first taxable year in which any part of the gain upon the conversion is realized, or (ii) subject to such terms and conditions as may be specified by the Secretary [of the Treasury] or his delegate, at the close of such later date as the Secretary or his delegate may designate on application by the taxpayer," replaces the converted property by purchasing other property similar or related in service or use to the property so converted, the gain from the disposition of the involuntarily converted property shall be taxable only to the extent that the amount realized upon such conversion exceeds the cost of the replacement property.

As previously stated, the plaintiff's lands in Potter County, Texas, were taken by the State of Texas in 1959, and the amount representing just compensation for the property was received by the plaintiff in June 1959. Therefore, under subdivision (i) quoted in the preceding paragraph, the plaintiff had the right until the end of the year 1960, or for approximately 1½ years, to replace the involuntarily converted property, if he wished to avail himself of the benefit provided for in Section 1033 of the 1954 Code. However, the plaintiff did not replace the two parcels of land by the end of 1960.

On May 18, 1964—which was approximately 3½ years after the expiration of the period prescribed by subdivision (i) for the replacement of the condemned parcels of land—the plaintiff sent to the Internal Revenue Service an application for an extension of the time within which to replace the involuntarily converted property. In the application, the plaintiff called attention to the circumstances that his wife had sustained an injury during Christmas week of 1959 and thereafter was an invalid for several months; that his wife had died in May 1962 of hepatitis; that the plaintiff himself had noticed a marked decline in his energy in the summer of 1960; that this condition had been diagnosed in the spring of 1961 as being due to a rectal cancer, for which the plaintiff had undergone surgery in the summer of 1961; and that the plaintiff had a permanent colostomy, which interfered to some extent with business and other activities. The plaintiff further stated that:

My wife's prolonged illnesses and my own probably were contributing factors to my lack of diligence in seeking an extension at an earlier date, and thereby avoiding the controversy which has arisen.

The plaintiff's request for an extension of time was denied on June 26, 1964, principally on the ground that the request was untimely.

■ The plaintiff did not, of course, have a *right* to an extension of the time prescribed by subdivision (i) for the replacement of the two parcels of land which the State of Texas took from the plaintiff in 1959. The Internal Revenue Service was empowered by subdivision (ii) to extend the period, but whether an extension should or should not be granted in a particular instance was discretionary with the agency. In the present case, the plaintiff's application for a

time extension was filed approximately 3½ years after the period which the plaintiff wished the agency to extend had expired at the end of 1960, and the agency denied the application principally on the ground of its untimeliness. The agency's range of discretion was certainly sufficient to permit a determination that the unfortunate circumstances referred to by the plaintiff, although regrettable, did not excuse the plaintiff's failure to submit an application for extension sometime before the end of 1960. The presentation which the plaintiff made to the Internal Revenue Service indicated that the serious aspects of the illnesses of himself and his wife did not develop until after 1960.

■ It is not the prerogative of the court to weigh the circumstances independently and decide whether, on the basis of such an independent exercise of judgment, it would or would not have regarded the plaintiff's delay in filing an application for an extension as excusable. Rather, the court is limited to a consideration of the question whether the Internal Revenue Service did or did not abuse its discretion in denying the plaintiff's application for an extension on the ground of its untimeliness. When the question is put in that fashion, I believe that the judicial answer must be in the negative.

In connection with this point, it is pertinent to note that the plaintiff actually had not purchased any replacement property as of the time when he submitted his request for an extension in May 1964, and he still had not purchased any replacement property as of the time of the trial in August 1967.

For the reasons previously stated, it is my opinion that the plaintiff is not entitled to recover on his claim for the refund of income tax paid by him for the year 1959.

LARAMORE, Judge (concurring):

The basic argument for not taxing these amounts in the year of receipt is that these funds are similar to securities in a lease agreement. I do not believe that they are similar. Advance payments by a lessee to a lessor, if made only to secure the lessee's performance of its lease agreement, are, in effect, loans which the lessor is obligated to repay and, therefore, the advance payments are not considered gross income to the lessor. Clinton Hotel Realty Corp. v. Commissioner of Internal Revenue, 128 F.2d 968 (5th Cir. 1942); Warren Service Corp. v. Commissioner of Internal Revenue, 110 F.2d 723 (2d Cir. 1940). If, however, the security deposits are, in reality, prepayments of rent received at the beginning of the lease-term, they are gross income to the lessor and taxable in the year of receipt. Renwick v. United States, 87 F.2d 123 (7th Cir. 1936); Astor Holding Co. v. Commissioner of Internal Revenue, 135 F.2d 47, 146 A.L.R. 993 (5th Cir. 1943); Commissioner of Internal Revenue v. Lyon, 97 F.2d 70 (9th Cir. 1938); Crile v. Commissioner of Internal Revenue, 55 F.2d 804 (6th Cir. 1932), cert. denied, 287 U.S. 600, 53 S.Ct. 7, 77 L.Ed. 523; and Treas. Reg. sec. 1.61–8(b). The problem is one of classifying the payment based on the purpose for which it is made, and this is generally a factual question to be resolved by an examination of the lease provisions and the intentions of the parties.

The rationale for not taxing security deposits is an analogy to loan transactions in that the advance payments are offset by an obligation to repay the same amount. Here, however, there is no definite obligation to repay the money withdrawn, merely a possibility that plaintiff will repay the money. In the advance payment situation, there is an immediate obligation to repay the funds subject to later events which might result in non-repayment. In this case, there is no immediate obligation to repay the funds and only later events will determine whether repayment will be necessary. The claim of right doctrine applies because prior to these later events plaintiff has the unrestricted and free use of the money and because there is no obliga-

tion to repay the money when it was received.

The only restriction on plaintiff's free and unrestricted use of the funds is that after the condemnation litigation terminates he may be required to return part of the funds. The possibility of future repayment, however, does not prevent the inclusion in gross income of amounts which, as the Supreme Court has stated, fulfill "[t]he rule announced in North American Oil [Consolidated] v. Burnet, supra, [which] requires a receipt without 'restriction on use' as well as under a claim of right." Healy v. Commissioner of Internal Revenue, 345 U.S. 278, 283 n. 14, 73 S.Ct. 671, 674, 97 L.Ed. 1007 (1953).

In United States v. Lewis, 340 U.S. 590, 71 S.Ct. 522, 95 L.Ed. 560 (1951), a payment of $22,000 in 1944 was made to plaintiff as a bonus, which sum he used as his own. In subsequent litigation it was held that the bonus was improperly computed and plaintiff was required to return some. $11,000 to his employer. The Court held that the $22,000 was includible in plaintiff's gross income of 1944 and that the possibility of its return did not affect its includibility, citing as authority its rule stated in North American Oil Consolidated v. Burnet, 286 U.S. 417, 52 S.Ct. 613, 76 L.Ed. 1197 (1932).

In Healy v. Commissioner, supra, taxpayers received salaries from their closely held corporation which, on audit, were held unreasonable compensation. Deficiencies were assessed against plaintiffs individually and also corporate deficiencies were assessed against them as transferees. Taxpayers argued that they were merely constructive trustees of the funds for the benefit of the corporation's creditors and, therefore, they had no claim of right to the funds. The Court found that they had received the funds under a claim of individual right and not as trustees.

Taxpayers next argued that their use of the funds was not unrestricted because all of the facts which gave rise to the transferee liability existed at the end of the taxable year. The Court rejected this argument and noted that there was no certainty at the end of the taxable year that a transferee liability would materialize. Plaintiff in this case is equally uncertain as to the possible future need to return the funds. The absence of a certain obligation to repay the moneys removes this case from those which equate rent securities to loan transactions. It is as likely that plaintiff will be required to return part of the amount he has received as it is that not only he will retain the amount received but that he will be given an additional award. The language of the Court in the *Healy* case is clearly applicable where it said:

The phrase "claim of right" is a term known of old to lawyers. Its typical use has been in real property law \* \* \*. The use of the term in the field of income taxation is analogous. There is a claim of right when funds are received and treated by taxpayer as belonging to him. The fact that subsequently the claim is found to be ·invalid by a court does not change the fact that the claim did exist. \* \* \* [345 U.S. at 282, 73 S.Ct. at 674.]

There is no need to attempt to list hypothetical situations not before us which put such restrictions on use as to prevent the receipt under claim of right from giving rise to taxable income. But a potential or dormant restriction, such as here involved, which depends upon the future application of rules of law to present facts, is not a "restriction on use" within the meaning of North American Oil v. Burnet, supra. [345 U.S. at 284, 73 S.Ct. at 675.]

As noted above, in order to be taxable under the claim of right doctrine, the amount must be received both under a claim by the taxpayer that he is entitled to the money as his own *and* it must be received free of restrictions on its disposition. The possibility of repayment after subsequent litigation does not affect these requirements. Plaintiff

here had a claim to the fund based on the condemnation award made to him and he could dispose of the funds as he pleased, free of any restrictions. In these circumstances, the amount is taxable in the year of receipt. As the Court in North American Oil Consolidated v. Burnet, supra, said:

> * * * They [the net profits] became income of the company in 1917, when it first became entitled to them and when it actually received them. If a taxpayer receives earnings under a claim of right and without restriction as to its disposition, he has received income which he is required to return, even though it may still be claimed that he is not entitled to retain the money, and even though he may still be adjudged liable to restore its equivalent. * * * If in 1922 [the year when the litigation was terminated] the government had prevailed, and the company had been obliged to refund the profits received in 1917, it would have been entitled to a deduction from the profits of 1922, not from those of any earlier year. * * *. [Citations omitted; 286 U.S. at 424, 52 S.Ct. at 615]

Plaintiff has urged the court to differentiate this case from the above rules because it involves capital gains and not salaried income, and because the case of Patrick McGuirl, Inc. v. Commissioner of Internal Revenue, 74 F.2d 729 (2d Cir. 1935), cert. denied, 295 U.S. 748, 55 S.Ct. 827, 79 L.Ed. 1693, is controlling. In the McGuirl case, the taxpayer's property was condemned by a resolution of the New York Board of Estimate in which it stated that the title to taxpayer's property thereby became vested in the City of New York as of December 1926. Plaintiff occupied the premises until October 31, 1927. No award was made until May 1928, when an amount was tentatively fixed. Plaintiff contested the proposed award and a final court decree was not made until April, 1929. The taxpayer reported his gain in 1929 but contended that it was proper-

ly taxable in 1926 when the property became vested in the City.

The court held that 1926 was not the proper year because the amount of the award was not known until 1928 (it was merely a proposed award until then). Therefore, the gain or loss could not be estimated. In contrast, plaintiff in this case knew the amount of the award and was entitled to, and did take, possession of the fund established as his condemnation award. The two cases are very different because the state procedures for making condemnation awards vary. In our case, plaintiff had a sum of money subject to his use and disposition while he was contesting the award. In the McGuirl situation, however, no comparable fund was either available to taxpayer or used by taxpayer during the process of litigating the amount of the award.

An appropriate analogy can be made to cases in which funds were withdrawn from court impounding, pending litigation. These sums were held taxable in the year of withdrawal. See Commissioner of Internal Revenue v. Brooklyn Union Gas Co., 62 F.2d 505 (2d Cir. 1933); Mel Dar Corp. v. Commissioner of Internal Revenue, 309 F.2d 525, 532–533 (9th Cir. 1962), cert. denied, 372 U.S. 941, 83 S.Ct. 933, 9 L.Ed.2d 967 (1963). See also, Rev.Rul. 55–317, 1955–1 Cum.Bull 215.

In the Brooklyn Union Gas Co. case, the New York Public Service Commissioner ordered plaintiff to reduce its rates. Plaintiff attacked the reduction as confiscatory (in a state court proceeding) and an interlocutory order was issued both staying execution of the rate reduction and impounding the amounts collected by plaintiff in excess of the reduced rates. The company withdrew the impounded excess collections by posting a bond for repayment if the reduced rates were later sustained. The Commissioner of Internal Revenue argued that the money was income to the taxpayer in the year when the rate litigation was finally decided. The court, however,

held the sums taxable in the year when plaintiff either withdrew the sums or had an option to withdraw the monies which it could freely exercise. It held:

> * * * Such money [the amounts withdrawn] was income, being payment for service already rendered, and was received by the companies without restriction upon its use. It is true they were subject to a contingent liability to pay back an equivalent amount if the rate litigation ultimately went against them. This liability, however, imposed no restriction upon their use of the money actually in their hands. Nor did the fact that they gave bonds to get it add anything to the contingent liability they were under regardless of such bonds. Termination of the rate litigation merely determined their right to retain income already received. * * *. [62 F.2d at 506]

I see no basis in this case for differentiating between plaintiff's capital gain income and other forms of income for the purpose of determining when these amounts are properly includible in gross income. A taking is, generally, equated to a sale or exchange for the purpose of income taxation. Commissioner of Internal Revenue v. Kieselbach, 127 F.2d 359 (3d Cir. 1942), affirmed, 317 U.S. 399, 63 S.Ct. 303, 87 L.Ed. 358 (1943). Plaintiff here is a cash basis taxpayer. It is clear that no citation of authority is necessary for the proposition that a cash basis taxpayer must pay tax on income he has received during his taxable year.

In Keneipp v. United States, 87 U.S. App.D.C. 242, 184 F.2d 263 (1950), the Federal government instituted condemnation proceedings against plaintiff and deposited $35,000 with the court. In the same year, 1941, a jury fixed compensation at $48,500. The $35,000 was paid plaintiff in 1941. Subsequent litigation involving the claims of an intervenor were not completed until 1942 when taxpayer received the balance due him, less an amount paid the intervenor. Taxpayer reported a gain in 1941 which the Commissioner of Internal Revenue challenged. The court held that the gain was to be reported in the year when an award is made and also held that the amount received in 1941 exceeded his adjusted basis for the property; at that time taxpayer had a taxable gain in the amount of such excess. The court emphasized the date when the award was made as the critical point in time for determining when such amounts are taxable.

In Nitterhouse v. United States, 207 F.2d 618 (3d Cir. 1953), cert. denied, 347 U.S. 943, 74 S.Ct. 638, 98 L.Ed. 1091 (1954) a case which is remarkably similar to the one now before the court, the United States instituted a condemnation action in 1944 and deposited some $5,000 with the court to be awarded to plaintiff after the amount of the award was litigated. In 1946, plaintiff received a judgment and was paid the previously deposited $5,000. Plaintiff argued that the year of taking, 1944, was when he should report his gain. The court, in discussing the deposited amount, considered whether plaintiff had a right to obtain and use the deposited fund, and found that he did not. It said:

> * * * This amount [the $5,000] was in excess of the taxpayer's basis for the land. * * * Money which has been set apart for a taxpayer and upon which he can draw is subject to tax as of that year.[4] The fact that the taxpayer did not ask for the money * * * should not be conclusive.
>
> However, we do not think that this deposit was available to the taxpayer at his will only. To withdraw it would have required a court order.[5] And to get that order the petitioner would have to show that he had a clear title to the land free from tax and judgment liens and so on[6] [as required by statute]. [207 F.2d at 620; footnotes omitted.]

In this case, however, the money was set apart for plaintiff and not only did he have an opportunity to obtain the funds, but in fact he did obtain the funds and make such use of it as he saw fit.

The gain occurred in the year of receipt when the award was made, deposited, and then withdrawn. There is no need to concern ourselves with the hypothetical circumstance where a taxpayer does not take possession of a deposited amount because that is not the case here and, therefore, to the extent that these amounts exceed his basis in the land, plaintiff is taxable in the year of receipt.

Both for the above reasons and for those stated in the per curiam opinion, it is my opinion that plaintiff is not entitled to recover on his claim for refund.

DURFEE and DAVIS, JJ., join in the foregoing concurring opinion.

SKELTON, Judge (dissenting):

I respectfully dissent from the opinion of the majority in this case. The majority base their decision primarily on the claim of right theory as set forth in North American Oil Consolidated v. Burnet, 286 U.S. 417, 52 S.Ct. 613, 76 L.Ed. 1197 (1932), and the other cases cited in support of this theory. In my opinion, the claim of right theory does not govern this case at all and should not be involved in our decision. The claim of right doctrine is expressed in the above cited case at page 424, at page 615 of 52 S.Ct. as follows:

> * * * If a taxpayer receives earnings under a claim of right and without restriction as to its disposition, he has received income which he is required to return, even though it may still be claimed that he is not entitled to retain the money, and even though he may still be adjudged liable to restore its equivalent. * * *

This theory has been misconstrued and expanded into a penumbral area by the courts far beyond what was intended and as a result the Internal Revenue Service is confused and the taxpayer is bewildered. However, there is one sanctuary from this creeping extension of the claim of right theory and that is the right of a state to declare and establish the basic and fundamental rights of its citizens in property located within its boundaries. This is a Texas case and Texas has, without any question, defined and established the rights of a property owner whose property is being condemned in a deposit made by the condemnor with the county clerk pending final award in the condemnation proceedings. We are bound by the Texas law in this regard and must be governed thereby even though Federal taxes are involved. We held in Henley v. United States, 396 F.2d 956, 964, 184 Ct.Cl. 315, 329 (1968):

> This is a Federal tax case. In such a case, where Federal tax liability turns upon the character of an interest in property, the nature of that interest rests on state law as determined by the highest court of the state. Commissioner of Internal Revenue v. Estate of Bosch, 387 U.S. 456, 87 S.Ct. 1776, 18 L.Ed.2d 886 (1967). Since this is a Texas case, the laws of Texas control the solution of the questions here presented. Davis v. Atlantic Oil Producing Co., 87 F.2d 75, 76 (5th Cir. 1936).

This brings us to an examination and discussion of the Texas law with regard to the interest and rights of a condemnee in a deposit made by the condemnor with the county clerk pending an appeal from the award of the commissioners and until final judgment is entered in the case. We look first to the Texas constitution and find that it provides that in a condemnation case compensation " * * * shall be first made, or *secured by a deposit of* money; * * *."[1] [Emphasis supplied.] Of course, the first part of this provision that "compensation shall be first made," refers to a situation where the condemnor and the condemnee agree on the amount to be paid and payment thereof is made and accepted. But if the parties cannot agree on the amount the second part of the provision becomes operative and the condemnor must ar-

---

1. Constitution of Texas, Article I, Section 17, Vernon's Ann.St.

range for compensation to be *secured by a deposit of money*. This provision of the constitution is implemented by statutes which establish procedures generally as follows:

When the condemnor files suit in the county court, the judge appoints three disinterested freeholders of the county to serve as special commissioners to assess condemnation damages. Their awards are filed with the county judge. If either the condemnor or the condemnee is dissatisfied with the award, he may file objections to the decision which constitutes an appeal and the case is tried de novo. Should the condemnor desire possession of the land pending litigation of the commissioners' award, it must deposit an amount equal to the award in court, subject to the order of the condemnee if the condemnor is the state or a designated subdivision thereof, otherwise the condemnor must deposit double the amount of the award *"to secure all damages."* If, upon final judgment, it is decided that the right to condemn did not exist, the land is returned to the condemnee, and he is entitled to temporary damages, if any, caused by his dispossession. These damages are paid from the deposit. The condemnee may withdraw any portion or all of the deposit pending the appeal, but if he withdraws more than the final valuation as determined by the final judgment in the county court, he must return the excess.[2]

The construction given to this procedure by the courts of Texas has firmly established that when money is thus deposited in the county court, *it is not payment, but security for payment*. The trial prescribed by Article 3255, supra, is unquestionably a trial de novo. Once either party files exceptions to the award, the commission's findings and award are wiped out completely and a trial de novo in the county court is contemplated and required. Culligan Soft Water Service v. State, 385 S.W.2d 613 (Tex. Civ.App.1964), writ of error refused n. r. e.; Lower Colorado River Au-

thority v. Burton, 170 S.W.2d 783 (Tex. Civ.App.1943); City of Houston v. Huber, 311 S.W.2d 488 (Tex.Civ.App. 1958). The condemnee can recover more or less than the commissioners' award, and proof of damages is not limited to that which was offered before the commissioners. Kennedy v. City of Dallas, 201 S.W.2d 840 (Tex.Civ.App.1947), writ of error refused. The Texas courts have carried the de novo characteristic of the proceeding to the point that the award of the commission is inadmissible in evidence in the trial of the case on appeal. The jury must decide the valuation damages issued independently and without any reference to proceedings before the commissioners. Chandler v. Bexar County, 258 S.W.2d 439 (Tex.Civ. App.1953), writ of error refused n. r. e.; Wallace v. Van Zandt County, 264 S.W.2d 202 (Tex.Civ.App.1954); City of Corpus Christi v. Magee, 285 S.W.2d 236 (Tex. Civ.App.1955); Lower Colorado River Authority v. Burton, supra; City of Houston v. Huber, supra.

It is made very clear by these cases that the appeal renders the commission's award a nullity, as though the previous proceeding before them had never occurred. Yet the condemnor, as a matter of policy, is given the right to take temporary possession of the property pending the outcome of the litigation provided the condemnor gives security that compensation will be made at the time of final judgment by depositing a sum of money in the registry of the county court. The constitution gives no standard regarding the amount of the deposit, but the statute selected the commissioners' award as a fair guarantee if the condemnor is the state or a designated subdivision thereof, otherwise, the deposit must be double the amount of the ward. The Texas courts have declared this deposit to be *security*, not *payment*.

In Ackerman v. Huff, 71 Tex. 317, 9 S.W. 236 (1888), the court found that a deposit into court satisfied the

---

2. Vernon's Annotated Civil Statutes of Texas, 1925, Articles 3264–3268.

constitutional requirement that compensation must be "[F]irst made or secured by a deposit of money." Although this *was not compensation made,* it was compensation secured. The distinction between payment and security was drawn also in McBride v. Aransas County, 304 S.W.2d 450 (Tex.Civ.App. 1957), writ of error refused, n. r. e., where the court held that a person must have a property right in land before he can require either payment or security in advance. The most influential case in this area is Fort Worth Concrete Co. v. State, 400 S.W.2d 314 (Tex.1966), rehearing denied, 416 S.W.2d 518. The Supreme Court of Texas declared in that case:

> \* \* \* Once possession is taken from the condemnee he is entitled to the *security* of the amount of the award placed in the registry of the court.
>
> \* \* \* \* \* \*
>
> \* \* \* To deprive a condemnee of his right to possession without guaranteeing payment for the value of that right is prejudicial in itself. That guarantee is provided by compliance with Article 3268, Vernon's Annotated Civil Statutes, requiring the condemnor if it should desire to enter upon and take possession of the property, to pay the condemnee the amount of the damages awarded by the commissioners or to deposit an equal amount in the registry of the Court. Once an award is made and the amount thereof is placed in the registry of the court *to the order of the condemnees,* and the land is occupied by the condemning authority, the interest of each condemnee is established in and attaches to that fund *as security* for any possible damage suffered by reason of his dispossession. While we concede that the State of Texas and Tarrant County are entities with high credit ratings, the protection and guarantee for the condemnee is statutory, and those statutes are to be strictly complied with where prejudice might other-

wise result. \* \* \* Id. 400 S.W.2d at 317. [Emphasis supplied.]

In Culligan Soft Water Service v. State, supra, the court described the situation pursuant to the deposit into court as follows:

> [U]nder such circumstances the State holds the land on a temporary basis, and *condemnee holds the money on the same temporary basis,* subject to a final judgment rendered upon a trial de novo. \* \* \* Id. 385 S.W. 2d at 615. [Emphasis supplied.]

In that case, the condemnee filed a motion to dismiss on the ground the condemnor had abandoned the appeal, and took the position that the award of the commissioners should be resurrected and given judicial effect. The court overruled the motion on the grounds that since the award of the commissioners had been wiped out by the appeal and a trial de novo was required, reincarnation was impossible. The court refused to leave the condemnor holding the land and the condemnee holding the money on a temporary basis, saying:

> \* \* \* [T]he State would be in temporary possession of the land, without any title, and the condemnee would be in possession of the award on a temporary basis, *without any permanent right to the money.* The creation of such a situation is unthinkable. Id. at 615. [Emphasis supplied.]

Thus, it may be seen that the court refused to recognize the deposit of the award as *payment* to the condemnee, and held that he had no *permanent* right to the money until final judgment was entered. This case is also authority for the proposition that title to the land does not vest in the condemnor and title to the deposit does not pass to the condemnee until final judgment is entered in county court.

An interesting case on the question under discussion is the case of City of San Antonio v. Astoria, 67 S.W.2d 321 (Tex.Civ.App.1933), aff'd 128 Tex. 284,

96 S.W.2d 783 (1936), rehearing denied, 128 Tex. 284, 97 S.W.2d 944. There the condemnor deposited the amount of the commissioners' award in the sum of $7,500 with the county clerk. The clerk misappropriated the money. When the final judgment of $10,000 in damages was entered in favor of the condemnee, the deposit of $7,500 was not available to be applied on the judgment. The condemnor took the position it should be given credit for its previous deposit of $7,500 on the final judgment. Of course, the condemnee contended otherwise. The issue before the court was, who should bear the loss, the condemnor or the condemnee. To put it another way, who owned the deposit at the time it was wrongfully taken by the county clerk? The condemnor contended that the deposit of the award amounted to payment to the condemnee and ended its liability to the extent thereof, and that the loss should fall on the condemnee. The condemnee, on the other hand, said the making of the deposit was not payment to him and the condemnor should bear the loss. The court held that the condemnor must bear the loss because *the deposit was not payment, but only security.* The court said:

> \* \* \* The statute does not provide that the deposit shall constitute *payment,* but that it shall be *security* for ultimate payment. \* \* \* To hold otherwise, and construe the statute to mean that a deposit shall constitute actual payment, would render the act invalid, as in contravention of the constitutional inhibition against the taking of private property for a public use, without compensating the owner therefor. Id. 67 S.W.2d at 322.

Another type of Texas case adds strength and emphasis to the principles announced and established by the foregoing Texas authorities, namely, the injunction-type of case. These are cases where the condemnor seeks an injunction which prohibits the condemnee from withdrawing the deposit pending final judgment in the case. The case of Carter v. City of Houston, 255 S.W. 2d 336 (Tex.Civ.App.1953) is a typical representative of these cases. In that case, the condemnor deposited the amount of the award made by the commissioners in the sum of $12,650 with the county clerk and took possession of the land involved in the case, and at the same time appealed the case to the county court. The condemnee filed an application to withdraw the deposit. The condemnor filed an answer opposing the withdrawal, with a cross-action for a temporary injunction prohibiting the condemnee from withdrawing the funds on the grounds that otherwise it would suffer irreparable damage for which it had no adequate remedy at law. The trial court granted the injunction and denied the application of the condemnee to withdraw the funds. The decision was affirmed on appeal by an opinion which stated:

> In the instant case it is undisputed that no tender was made of the award to appellants [condemnees] by appellee [condemnor]; that *the fund is owned by the appellee, City of Houston,* [condemnor], and that *it was deposited in the registry of the court as security* to the appellants [condemnees] for the payment to them of the adjudicated amount of damages to which they might become entitled. Id. at 337. [Emphasis supplied.]

This is an unequivocal statement by the court that even after the deposit has been made it is still the property of the condemnor and it has been deposited only as security for the condemnee. Furthermore, the condemnee was restrained from withdrawing it. Under these circumstances, how could it be said that the deposit belonged to the condemnee "under a claim of right," or that the deposit constituted "earnings" or "income"to him?

The case of Brazos River Conservation & Reclamation Dist. v. Allen, 166 S.W. 2d 388 (Tex.Civ.App.1942), modified, 141 Tex. 217, 171 S.W.2d 847 (1943), is another injunction case where the court denied the application of the con-

demnor for an injunction restraining the condemnee from withdrawing the deposit, because it did not allege and prove that condemnee was insolvent or under any other disability to carry out the final judgment of the court, and because it did not show an absence of a "legal remedy." The inference was that if these matters had been alleged and proven, the injunction would have been granted.

It would be a most unusual and extraordinary legal procedure for a man to be enjoined from taking possession of his own property. However, it would not be unusual for a person to be enjoined from taking possession of property that is merely security and belongs to someone else if it is shown that he might dissipate the security and because of insolvency or otherwise be unable to restore it, thereby causing damage to the owner who has no adequate remedy at law. It would be easy to paraphrase this statement to exactly fit the situation we have been discussing relative to deposits in condemnation cases. All of which shows without question that the court was correct in Carter v. City of Houston, supra, when it held that the deposit is made as security for the condemnee and is still owned by the condemnor after it is made.

The foregoing Texas authorities, by which we are bound, show without question that the deposit by the condemnor is not payment to the condemnee but only security for him to guarantee the payment of his damages on final judgment. This is true even if the condemnee withdraws the money, because when this is done the condemnee does not have the money under a claim of right *but only has the temporary use of it*. The Texas law allows him to have the temporary use of the money to offset his loss of the temporary use of his land which has been taken temporarily by the condemnor. The condemnee's temporary use of the security deposit merely offsets his loss of earnings from his land caused by the temporary seizure of the land by the condemnor. In sum,

it is clear that the condemnee is allowed the temporary use of the security deposit as an income replacement for his land during the temporary use of the land by the condemnor. The deposit is not payment to the condemnee but only security and the condemnee has no present right or claim of full ownership with respect to it. Thus, the Texas courts have defined and established the property rights of the condemnee in a condemnation deposit and we are required to recognize these rights in the case before us.

A well established principle of law is that when a taxpayer receives money as security, it is not income to him until and unless it loses its character as security and becomes payment or income. This may or may not occur during the year of receipt, or it may not occur at all. This principle is involved in the case before us. It is also involved in lease agreement cases where the tenant deposits money with the landlord as security for the payment of rent due under the lease. There, the decisive question is always whether the deposit is in reality advance rental rather than security. If the deposit is considered as rental, it is taxed when received; but if it is security, taxation is deferred until it becomes rental. The deposit in these lease agreement cases is very similar to the deposit in the case before us. It is generally held in such cases that if the deposit is paid and received as security with no present right or claim of full ownership, it is not income and not taxable when received even though the landlord has the unrestricted use of it and has to account for it at the end of the lease. This is more or less analogous to the situation relative to the deposit in the case before us. For this reason, I will briefly review some of these lease agreement cases in the hope they will assist in solving the problems in our case.

In Warren Service Corp. v. Commissioner of Internal Revenue, 110 F.2d 723 (2d Cir. 1940), the lessor received $125,000 in 1926 as security for the

performance of a lease. The sum was available for the lessor's general use and was not to bear interest. The court held that the sum was not taxable to the lessor in 1926, and only became taxable in 1933 when the lessee released its interest in the deposit.

In the case of Clinton Hotel Realty Corp. v. Commissioner of Internal Revenue, 128 F.2d 968 (5th Cir. 1942), the taxpayer leased its hotel in 1935 for a term of ten years for an annual rental of $21,000. The lease required the lessee to deposit the sum of $21,000 upon the execution of the lease which was to be held by the lessor as security for the faithful performance of the lease by the lessee and, if the lease was still in effect and had been performed by the lessee, the lessor was requested to apply said deposit of $21,000 on the tenth year's rent installment. The lessor did not include the $21,000 security deposit as income during the fiscal tax year of 1936, considering it to be a deposit for the security of the tenth year's rent and for lessee's performance of other provisions of the lease. The Commissioner of Internal Revenue held that it was income when received and the Board of Tax Appeals upheld him. See 44 B.T.A. 1215 (1941). Additional taxes were assessed against the taxpayer and he filed suit for review of the decision of the Board of Tax Appeals. The Fifth Circuit Court of Appeals reversed the Board of Tax Appeals saying that if the $21,000 was paid and received as rent in advance, it was taxable when received, but it held that this was not the case and in so holding it said:

> * * * On the other hand, if it was paid and received as *security*, with no present right or claim of full ownership, it would not be presently income, although it was expected finally to be applied in payment of the last year's rent if nothing happened to prevent. * * * In the latter situation, though the money is rightfully received, and if the parties so intend may be freely used, yet because of the acknowledged liability to

account for it, there is no gain; *just as in borrowing there is none.* Id. at 969. [Emphasis supplied.]

The court in that case took pains to point out that the claim of right doctrine on which the majority depends in the case at bar did not apply by saying:

> * * * The case of North American Oil Consolidated v. Burnet, 286 U.S. 417, 424, [52 S.Ct. 613, 76 L.Ed. 1197], has no application, for the recipient of the money there claimed it was fully his, he acknowledged no right in another, and the holding was that a contrary claim by that other which might prove good would not prevent the receipt of the money being present income. * * *. Id. at 969.

The court there concluded that there was no tax due on the $21,000 security deposit until the tenth year (1944) when it would be applied on the rent for that year, saying:

> We are of opinion that no present gain was realized by this borrowing of the $21,000, and that the rent for the tenth year cannot be properly accrued as income because of it unless and until there is an application of the $21,000 security on June 3, 1944. * * * Id. at 970.

In the case of John Mantell, 17 T.C. 1143 (1952), the situation was very similar to that in Clinton Hotel Realty Corp. v. Commissioner, supra. The taxpayer leased a hotel for a period of ten years beginning in 1946 and ending in 1956. The lease required the lessee to deposit $43,320 with the lessor to be held by him as *security* for the performance by the lessee of the terms of the lease and to indemnify the lessor against any damage to the premises. The deposit was always designated in the lease as security and never as prepaid rent. Both parties at all times regarded the sum as a security deposit and the lessor always acknowledged that he was accountable to the lessee for it and that he was required to return it to the lessee at a future date. The security deposit was not to be applied as rent and the lessor was not required

to pay interest on it or to keep it in a separate account but had the full use of it. The question before the court was whether the security deposit was income to the lessor and taxable as such when received. The court held that the money was a security deposit and not the advance payment of rental and that it was not taxable to the lessor. The court said:

If, * * *, the sum was deposited to secure the lessee's performance under the lease, it is not taxable income even though the fund is deposited with the lessor instead of in escrow and the lessor has temporary use of the money. Warren Service Corporation v. Commissioner, [2 Cir.] 110 F. 2d 723, affirming on this point and reversing on another, 39 B.T.A. 856; Clinton Hotel Realty Corporation v. Commissioner, [5 Cir.] 128 F.2d 968; Estate of George E. Barker, 13 B.T.A. 562. * * * Id. at 1148.

* * * * * *

* * * In our opinion, the deposit was a security payment and as such it did not constitute taxable income when received in 1946. * * * Id. at 1149.

These principles were upheld in the case of Harcum v. United States, 164 F. Supp. 650 (E.D.Va.1958). In that case a lease was executed and the lessee deposited $1,000 with the lessor as a security deposit to guarantee the performance of the provisions of the lease by the lessee and providing that this deposit would be applied on the last three and a fraction months of the lease if the lessee had not forfeited the security deposit for nonperformance of the lease before that time. In holding that the lessor was not required to keep the money in a special deposit, the Government argued that the taxpayer should be required to pay taxes on the deposit when received because he was on a cash basis system of accounting and because the deposit was income to the lessor at the time it was made. The court rejected these arguments of the Government and held:

In *Clinton Hotel Realty Corp.* v. *Commissioner*, 5 Cir., 128 F.2d 968, the

point in question was decided adversely to the Commissioner. The mere fact that the lessor is not required to hold the fund as a special deposit does not in itself destroy the character of the deposit as security. As it is conceded that the lessees have not defaulted under the terms of the lease, the amount received by the lessors is not taxable as income until such a default occurs, or until the last three and a fraction months of the term of the ten year lease. * * * The fact that taxpayer operated on a cash, rather than on an accrual, basis does not lend support to defendant's position. In the absence of a default the lessors are obligated to credit the security deposit against rent during the last three months of 1959 and a fraction of the month of January, 1960. Id. at 651.

* * * * * *

The same principles were adhered to by the court in the case of Executors of the Estate of Barker, 13 B.T.A. 562 (1928). In that case the lessor leased certain property for a period of 99 years. The annual rent was quarterly. However, the lessee was required to deposit $50,000 as security for the performance of the provisions of the lease by the lessee. The lessor was to hold the $50,000 security deposit during the entire term of the lease and was not required to pay any interest thereon nor was he required to put the money in escrow or in a trust fund; but, on the other hand, the security deposit became a part of his general assets and could be used by him without restriction. During the period of the lease should the lessor neglect or refuse to comply with the terms of the lease and by reason thereof the lessor suffered the loss of rent due by the lessee or had to pay taxes, insurance, or discharge any lien against the property, the lessor had the right to deduct these amounts from the $50,000 deposit. The lessee was also given an opportunity to buy the property for a designated price at any time during the period of the lease. It was provided that should this option be exercised by the lessee, the $50,000 security

deposit, or such part of it which remained on hand in accordance with the terms of the lease, would be applied on the purchase price.

The Commissioner of Internal Revenue took the position that the security deposit was a bonus paid for the lease and the lessor should be required to pay taxes on it as income during the year it was received. The taxpayer on the other hand, contended that the payment was in the nature of a cash bond as security for the performance of the lease by the lessee. The court, after discussing the facts and the various contentions of the parties, ruled for the taxpayer saying:

\* \* \* The payments were not income to deceased [lessor] when received any more than borrowed money is income when received. Id. at 567.

\* \* \* \* \* \*

We are of the opinion that this money was paid to deceased [lessor] as security in the nature of a cash bond, and that the respondent erred in including it as income in the years received. Id. at 568.

It will be observed that in these lease agreement cases the taxpayer received the deposits as security and not under a claim of right. The deposits were held to be security even though they were not required to be placed in a special account and the taxpayer had unfettered use of the funds without any restrictions whatsoever. The courts held that the deposits were not taxable as income when received by the taxpayer since they were in the nature of security deposits, and were not taxable until and unless they lost their character as security deposits and became payments to the taxpayer. Some of the cases drew an analogy between the deposits and borrowed money and considered the taxpayer's use of the money as a temporary use. All of these principles should be applied to the case at bar. In our case, as was pointed out above, the Texas courts have definitely determined that a deposit by the condemnor in a condemnation case pending the appeal of the case is in the nature of security to the lessee, and this remains true even though the lessee withdraws the money and has the temporary unfettered use of it (as in the lease agreement case) pending final judgment in the case. The condemnee does not receive the money as a payment nor under a claim of right and consequently it is not income to him until final award is entered in the case. The claim of right theory relied upon by the majority and as set forth in North American Oil Consolidated v. Burnet, supra, does not apply in our case any more than in the case of Clinton Hotel Realty Corp. v. Commissioner, supra, where the court specifically pointed out in its opinion that the claim of right theory in said case did not apply to a security deposit.

The majority opinion required the plaintiff to pay capital gains tax on the security deposit during the year in which he withdrew it, even though when he received the money there was no way that he could determine whether or not at the time of the final judgment he would have a capital gain or a loss, and, if either, how much. In my opinion, this is not the law and should not be the law. A case directly in point is Virginia Iron Coal & Coke Co. v. Commissioner of Internal Revenue, 99 F.2d 919 (4th Cir. 1938), cert denied, 307 U.S. 630, 59 S.Ct. 833, 83 L.Ed. 1513 (1939). In that case the taxpayer granted an option to a prospective purchaser called the Texas Company for the sale of certain property at a designated price, and, the purchaser, in accordance with the agreement paid the taxpayer $300,000 in 1930 and $125,000 in 1931. The agreement provided that these payments were to be credited upon the purchase price of the property in the event the Texas Company exercised its option. In 1933, the Texas Company notified the taxpayer that it would not exercise the option and accordingly, the two payments in the sum of $425,000 were forfeited to the taxpayer. The question involved in that case was whether the taxpayer should show the two payments as income during the respective years when they were received or show them as income

in the year 1933 when the contract was finally terminated. The taxpayer sought to show the $300,000 as taxable income in 1930 and the $125,000 as taxable income in 1931. The Commissioner of Internal Revenue took the position that the act was not completed for income tax purposes until the Texas Company surrendered its right under the option in 1933, and that both of such payments should be shown as income in that year. It is interesting to note that the positions of the parties in that case were exactly opposite to the positions of the parties in our case. There, the taxpayer argued that the payments were taxable as income in the years in which the money was actually received, whereas, the Government contended that the payments were taxable in the year 1933 when the option was terminated, and, when "* * * *for the first time*, it became possible to determine whether they were to be forfeited to the taxpayer or were to decrease the amount to be paid as the final purchase price." Id. at 921. [Emphasis supplied.] The court held in that case that the two payments should not be taxed as income during the years they were received by the taxpayer, but should be taxed in 1933, the year in which the Texas Company released its option, because it was not until 1933 that the taxpayer could know whether it had a gain or a loss on the transaction and that no tax was due until this was known. In this connection, the court said:

> * * * A reading of the option discloses, however, that at the time the payments were made it was impossible to determine whether they were taxable or not. In the event the sale should be completed, the payments became return of capital, taxable only if a profit should be realized on the sale. Should the option be surrendered it would then become certain, *for the first time*, that the payments constituted taxable income. *Thus it will be readily seen that it was impossible to tax these payments in the year in which they were made.* * * * Id. at 921. [Emphasis supplied.]

* * * * * *

The year 1933 was the year in which the Texas Company notified the taxpayer that it surrendered all rights under the option and was the year in which the tax attached to the payments. *The situation is in no way affected by the fact that the money became the property of the petitioner when received.* Id. at 922. [Emphasis supplied.]

The principles involved in the foregoing case are practically identical to those involved in our case. It is interesting to note that the Government took the position in that case that there was no way for the taxpayer to know whether he had a gain or a loss until the final event occurred, which was the releasing of the option by the Texas Company in 1933. This position is exactly contrary to and inconsistent with the position the Government takes in our case in that here it says that the plaintiff must pay capital gains taxes on the security deposit at the time he received it even though he had no way of knowing at that time whether he would have a capital gain or loss and even though this could not be determined until the final event occurred, which, in our case, was the entry of the final judgment in county court.

In our case, the Government makes a great deal to do over the fact that the plaintiff actually received the security deposit money and used it for his own purposes, and urges upon the court the claim of right doctrine by pointing out that the plaintiff got the money and used it, and, therefore, the claim of right theory must be applied. In the *Virginia Iron Coal & Coke Co.* case, supra, it is significant that the court said that *it did not make any difference that the money become the property of the taxpayer when received.* Of course, that goes much further than the situation which exists in our case. I have shown that the fund involved in our case is only a security deposit and not payment and that the plaintiff did not receive the deposit as payment nor under a claim of right. The fact that the taxpayer re-

ceived the money and used it pending the appeal is of no consequence. It was in the nature of a borrowing. It goes without saying, if a taxpayer borrows money, he *receives* it and *uses* it, but it is not taxable income.

In the case of Bourne v. Commissioner of Internal Revenue, 62 F.2d 648 (4th Cir. 1933), cert denied, 290 U.S. 650, 54 S.Ct. 67, 78 L.Ed. 1048, the taxpayer received earnest money in the sum of $5,-000 in 1925 in connection with the sale of a tract of land. The balance of the purchase price in the sum of $20,000 was paid to him in 1926, when the sale was closed. The question in that case was whether the taxpayer could include the $5,000 in earnest money as income in 1925, the year it was received. The court held that he could not do so, but must report the entire $25,000 as income in 1926 saying:

> * * * [T]he question of whether the payment was to be income or not could not be determined until the sale was completed. * * * Id. 62 F.2d at 649.

Also, in the case of Aiken v. Commissioner of Internal Revenue, 35 F.2d 620 (8th Cir. 1929), aff'd on other grounds, 282 U.S. 277, 51 S.Ct. 148, 75 L.Ed. 339 (1931), the purchaser of an option to buy property deposited $50,000 in 1916 with the taxpayer who owned the property. The $50,000 was to be applied on the purchase price if the option was exercised. The deal was completed in 1917 and the balance of the purchase price was paid at that time. The question in the case was whether the $50,000 should be included in the taxpayer's income for the year 1916, the year in which it was received, or included along with the other income in 1917. The court held that it should be included in his income in 1917, for the reason that until the entire amount had been paid, the gain could not be computed. The court said in this regard:

> The $50,000 paid during the year 1916, although a part of $1,250,000 that was finally paid, was not income merely because it was a payment, for

the reason that, *until the entire amount had been paid, the gain could not be computed.* * * * Id. 35 F.2d at 624. [Emphasis supplied.]

From these decisions it is clear that the fact that the taxpayer receives money does not make it income to him even if it is in the nature of a payment. The crucial fact seems to be the happening of the final event which makes it possible for the taxpayer to know whether he has a gain or loss and is able for the first time to determine whether he owes any taxes. As was said in the case of MacLaughlin v. Alliance Ins. Co., 286 U.S. 244, 249, 52 S.Ct. 538, 539, 76 L.Ed. 1083 (1932):

> * * * Realization of the gain is the event which calls into operation the taxing act, * * *.

This principle was applied in Luckenbach Steamship Co., 9 T.C. 662 (1947), which involved the requisition of three ships by the United States from the taxpayer owner in 1942. The ships were sunk by enemy action the same year. The taxpayer collected some of its loss from private insurers in 1942 which was includible in its 1942 income. The balance of the value of the ships was collected from the War Shipping Administration (WSA) in 1944 after three years of controversy, which resulted in a gain to the taxpayer. It reported this gain as income for 1944, the year in which it was finally collected. The Commissioner of Internal Revenue contended it should have been reported in taxpayer's income for 1942. The court held for the taxpayer, saying:

> To ascertain with any degree of certainty the amount it would receive from WSA, petitioner [taxpayer] was required to await the outcome of the controversy between WSA and the Comptroller General and the further action of WSA, or to institute suit for just compensation. Since the amount to be received by petitioner depended upon events which did not occur in 1942, and over which petitioner had no control, it is our conclusion that the gains upon the amounts received from

WSA were not accruable in 1942 and, hence, not includible in 1942 income. Id. at 675–76.

It should be noted that the foregoing case involved a capital gains tax. The gain was not realized and the tax was not due until the final event took place (collection of the money in 1944) which "called into operation the taxing act." It was not until then that the taxpayer was able for the first time to know what his gain was and how to determine his tax.

A somewhat similar case on principle is United States v. Harmon, 205 F.2d 919 (10th Cir. 1953). There the taxpayer's contract with the Government provided for the retention by the Government of thirty percent of the fixed fee until final acceptance of the work. The taxpayer executed a certificate of completion of the work in 1943, but was unable to collect the balance due him from the withheld thirty percent until 1944. In the meantime, the Government deducted various disallowed items from the amount withheld. The taxpayer reported the balance finally paid to him in his 1944 income, the year in which it was paid to him. The Commissioner of Internal Revenue contended it should have been reported in taxpayer's 1943 income. The court held in favor of the taxpayer because the amount he was entitled to receive did not become fixed, final, or determined until 1944. The court said:

> * * * [I]t cannot be said that during 1943 Harmon's [taxpayer's] right to receive a definite, certain amount of the retained fee had become fixed and final. At the end of 1943, Harmon's interest in the retained portion of the fixed fee was subject to proper set-offs and deductions, if any, which might be revealed by the final audits. A number of things remained to be done upon which the determination of that amount depended. *. * * These matters were not determined until in 1944 and until that was done Harmon's interest in the amount of the fixed fee remaining in the Government's hands was not established with finality

and certainty. * * * An unconditional liability on the part of the Government to pay Harmon a fixed and definite sum did not arise in 1943. * * * [A]nd this did not occur until 1944 and as a result no income tax liability arose with respect to the amount in question until in 1944. Id. at 921.

Applying these decisions to our case, it is clear that the event which called into operation the taxing act was the entry of the final judgment in the condemnation case, and, until that event took place there was no realization of gain and the plaintiff should not have been required to pay any tax until that event took place.

A case very much in point is Patrick McGuirl, Inc. v. Commissioner of Internal Revenue, 74 F.2d 729, 730 (2d Cir. 1935), cert. denied, 295 U.S. 748, 55 S. Ct. 827, 79 L.Ed. 1693. In that case the City of New York condemned the property of the taxpayer in 1926 and the award was made in 1928. The taxpayer appealed the case and the final decree was entered in 1929, when he received the money. The taxpayer was on an accrual basis and contended that the award was taxable in 1926, but the Internal Revenue Service argued that it was taxable in 1929, the year of the final award and the year the taxpayer received the money. The court upheld the position of the Internal Revenue Service and held that the gain did not accrue to the taxpayer until 1929, because the gain or loss of the taxpayer could not be computed with any degree of accuracy until the final judgment was entered in the case. This is exactly in accordance with the position of the taxpayer in the case before us. In this connection, the court in the last cited case said:

> The obligation to pay arose in 1926, when the title vested in the city, but the gain could not have been estimated in 1926 with any degree of accuracy, for the amount depended upon uncertainties of the future. In Burnet v. Huff, 288 U.S. 156, 53 S.Ct. 330, 77 L.Ed. 670. * * *, it was pointed

out that the existence of liability is not enough to establish the gain or loss to be taxable in a year. The gain must be "actual and present, not merely contemplated as more or less sure to occur in the future." Weiss v. Wiener, 279 U.S. 333, 49 S.Ct. 337, 73 L.Ed. 720, * * *; Lucas v. American Code Co., 280 U.S. 445, 50 S.Ct. 202, 74 L.Ed. 538, 67 A.L.R. 1010, * * *. As a general proposition, where the right to receive money is certain, namely, the liability to pay is unconditional, and books are kept on an accrual basis, the money actually received is considered income as of the year the right to receive it arose and not as of the year when received, even though the amount to be received is not certain as of the year the right to the money accrued. But here, though the petitioner was entitled to just compensation for property condemned under eminent domain, the amount of the award was to be determined in judicial proceedings involving values placed upon the real estate by expert testimony. These are indefinite, depending upon the court's conclusion as to values. The amount awarded may not have been as much as the cost of the property to petitioner. The expenses incident to the prosecution of petitioner's claim necessarily were reflected in the net gain to be realized, and interest was to be added as part of the award. The amount of interest was directly dependent upon the duration of the litigation. Thus the amount of award depended upon the course of future events. Lucas v. American Code Co., supra. Unless all the events which fixed the amount and determined the liability of the city to this taxpayer occurred within the year, it may not be said that this was taxable in the year the right to an award accrued. Bauer Bros. Co. v. Com'r of Internal Revenue (C.C.A.) 46 F.2d 874. In Continental Tie & Lumber Co. v. United States, 286 U.S. 290, 52 S.Ct. 529, 76 L.Ed. 1111, * * *, the whole sum to be determined upon in the future was income, and the amount was a calculation based upon entries in the taxpayer's book in accordance with the rules and requirements of the Interstate Commerce Commission. In the instant case there was no assurance that there would be any gain. * * *

The above holding is almost on all fours with the case before us, except that facts which exist in our case are more favorable to the taxpayer than they were in that case. For instance, in that case, under New York law, the title vested in the city when the property was condemned in 1926, although final award was not entered until 1929. We have pointed out that in Texas, title does not vest until final award is made and the condemnor only has temporary possession of the land until final judgment is entered.

The Government and the majority attempt to distinguish that case from the case of North American Oil Consolidated v. Burnet, supra, on the ground that in the latter case the taxpayer was on a cash basis but in *McGuirl*, supra, the taxpayer was on an accrual basis. While I agree that the two cases should be distinguished for many reasons, in my opinion, the difference between the two cases should not be based on the "cash basis" versus "accrual basis" reasoning. They are rather to be distinguished on many other grounds including, among others, the following:

In North American Oil Consolidated v. Burnet, supra, the following facts were present which are not present in the *McGuirl* case nor in the case at bar:

1. The amount was definite and fixed at the time the money was received.

2. The money that was received was payment and, therefore, "earnings" or "income" to the taxpayer.

3. The money was received by the taxpayer under a claim of right.

4. The amount of earnings or income was definitely known to the taxpayer at the time the money was received.

5. The case did not involve capital gain, but ordinary income.

In addition to the foregoing, we have the following additional facts in our case which further distinguish it from the *North American Oil Consolidated* case:

1. The deposit was not payment, but security only.

2. The deposit was the property of the condemnor even after it was made and until final judgment was entered.

3. The condemnee only had temporary use of the money until final judgment, which was akin to his having borrowed it.

4. There was no gain realized by the taxpayer until final judgment was entered.

5. The taxpayer could not know whether he had a gain or a loss until final judgment was entered.[3]

In our case, it would not matter, in my opinion, whether the taxpayer was on a cash basis or an accrual basis, because under either basis there could be no realization of gain by him until the final judgment was entered. Until that event took place, he certainly had no gain since he was on a cash basis. The same result would have occurred had he been on an accrual basis, because, under Texas law, until the final judgment was entered, nothing accrued to him. Accordingly, the attempt to distinguish our case from the *North American Oil Consolidated* case on this basis is misplaced. It should be emphasized that there are so many differences between that case and the other cases cited by the majority and our case, and there are so many ways to distinguish them, as has been pointed out above, the claim of right theory announced in those cases, which is relied on almost exclusively by the Government and the majority as controlling the case at bar, should not be applied in any degree whatsoever to the instant case.

During oral argument, in answer to a question from the bench as to when taxes were due by the condemnee on the deposit, counsel for the Government stated that, in his opinion, capital gains taxes were due by the taxpayer in our case at the moment the condemnor deposited the money with the county clerk. Perhaps the question was to some extent unfair to Government counsel inasmuch as the point is not directly involved here and was not briefed, and for the further reason that he probably was not familiar with the Texas law. However, it is mentioned because it shows the thinking of the Government in cases of this kind and also illustrates the inconsistent position which the Government takes in cases like the one before us. For instance, if the Government was consistent and followed its counsel's expressed idea that taxes were due at the moment the condemnor makes the deposit, it would have so contended in the *McGuirl* case, supra. As a matter of fact, that was exactly the position of the taxpayer in that case and he was on an accrual basis. But there, the Internal Revenue Service took the opposite position and contended the deposit was not taxable at the time it was made, but was taxable during the year that final judgment was entered and the taxpayer received the money.

If taxes were due in our case at the time the deposit was made, as stated by counsel for the Government, we would have a situation where the taxpayer would be required to pay taxes on money which was still owned by the condemnor. This is made clear by the case of City of San Antonio v. Astoria, supra, where the county clerk misappropriated the deposit pending appeal and the court held that the condemnor must bear the loss because it still owned the deposit and the condemnee has never received it. Also, it should be pointed out that under Texas law, the taxpayer may contest the entire condemnation proceedings, including the

---

3. For the same reasons, the case at bar and the *McGuirl* case, supra, are also distinguishable from the following cases cited by the majority:

"United States v. Lewis, 340 U.S. 590, 71 S.Ct. 522, 95 L.Ed. 560 (1951);

Healy v. Commissioner of Internal Revenue, 345 U.S. 278, 73 S.Ct. 671, 97 L.Ed. 1007 (1953); James v. United States, 366 U.S. 213, 81 S.Ct. 1052, 6 L.Ed.2d 246 (1961)."

right of the condemnor to condemn the land, if he does not withdraw the deposit. See Luby v. City of Dallas, 396 S.W.2d 192 (Tex.Civ.App.1965), writ refused, n. r. e.; Vernon's Annotated Civil Statutes of Texas, 1925, Article 3268, paragraph 3. Accordingly, it is possible that the taxpayer can win the case on final judgment, and, in such case, the deposit would be returned to the condemnor and the taxpayer would keep his land. But according to the expressed view of counsel for the Government, the taxpayer would, in the meantime, have been required to pay taxes which he did not owe at the time of the deposit. This would lead to impossible and unfair situations as far as taxpayers are concerned. Also, under such a theory, the taxpayer would be paying taxes when no gain had been realized and when he had not received any earnings or any income whatsoever.

It should be mentioned that the Government takes a position in expense deduction cases which is inconsistent with its position in our case. This is shown in the case of Dixie Pine Products Co. v. Commissioner of Internal Revenue, 320 U.S. 516, 64 S.Ct. 364, 88 L.Ed. 270 (1944), which is a case involving facts which are the obverse of those in our case. There the taxpayer was required by the State of Mississippi to pay gasoline state taxes in 1936 on a solvent which he used in his business and which the state claimed was gasoline. The taxpayer paid the tax for that year, but in 1937 he got an injunction against the state prohibiting it from collecting the tax for that year. Being on an accrual basis, the taxpayer nevertheless deducted the gasoline tax assessed by the state in 1937 as an expense of his business and reported it as a deduction on his income tax for that year while his injunction suit was being appealed. In 1938, the injunction was made final in favor of the taxpayer and he never had to pay the gasoline tax for 1937 which he had taken as a deduction for that year on his income tax returns. To correct the situation, the taxpayer included the amount of 1937

deduction as income and as a recovery in his income tax returns in 1938. In the meantime, the Commissioner of Internal Revenue disallowed the deduction for the year 1937. The case reached the Federal courts. The Government took the position that the taxpayer should not be allowed to take a deduction until all of the events have occurred which fixed the amount, and that he must wait for final judgment to be entered in the state court litigation before he could know definitely what deduction he could take. The Supreme Court upheld the contention of the Government in the following language:

* * * It has long been held that in order truly to reflect the income of a given year, all the events must occur in that year which fix the amount and the fact of the taxpayer's liability for items of indebtedness deducted though not paid; and this cannot be the case where the liability is contingent and is contested by the taxpayer. Here the taxpayer was strenuously contesting liability in the courts and, at the same time, deducting the amount of the tax, on the theory that the state's exaction constituted a fixed and certain liability. This it could not do. It must, in the circumstances, await the event of the state court litigation and might claim a deduction only for the taxable year in which its liability for the tax was finally adjudicated. Id. at 519, 64 S.Ct. at 365.

In other words, the court said that the taxpayer could not know what his deduction was until final judgment was entered in the state court litigation and that he must wait until this event took place and his deduction definitely fixed by such judgment before he could take a deduction. The reasoning of the court was that until final judgment was entered, there was no way that the taxpayer could know what his deduction was. The same reasoning should be applied to our case with respect to capital gain. That is, there was no way that the taxpayer could know what his capital gain, if any, was until final judgment was entered

in the condemnation case. Therefore, he should not be required to pay capital gains taxes until he knows what his gains and his taxes are. If a taxpayer is to be denied a deduction because he does not know definitely what the deduction is going to be until a judgment is entered in a pending lawsuit, he should not be required to pay capital gains taxes in a condemnation case when he does not know what the gain, if any, is going to be until final judgment is entered in the case. The "all events" theory applied to a taxpayer's deductions should also be applied to his capital gains. In other words, until all the events have occurred which determine the liability (for a deduction), or the capital gain (for a tax), as the case may be, and the amount thereof can be determined with reasonable accuracy, there should be no deduction on the one hand nor tax on the other.

The Government also takes the position in the instant case that Section 451 (a) of the Internal Revenue Code of 1954 and the Regulations thereunder required the taxpayer to include in his "gross income" for 1959, the amount of the deposit he withdrew in that year. In my opinion, this is a strained construction of the meaning of this section of the Code. It does not require a taxpayer to include an item in his income for a given year which is not income. I have already pointed out the many reasons why this security deposit was not income to plaintiff until final judgment was entered in his case in 1964. He was no more required to report this deposit as income in 1959 than he would have been had he borrowed the money from a bank or loan company.

The record here shows that the Government condemned some of the taxpayer's land for highway purposes and that the property taken was a strip of land across his farm. The condemnor destroyed his fences and otherwise damaged the remainder of his land. Damages in this kind are known as severance damages. The amount of such damages is not shown. Severance damages are not taxable, because the land owner is merely being "made whole" to compensate him for his loss when he is awarded this type of damages. If the taxpayer is required to pay capital gains taxes on the deposit, either at the time the deposit is made or at the time he withdraws the money and before final judgment, it is possible that he would be paying taxes on severance damages which may be awarded to him in the final judgment and which are not taxable, assuming he has no gain over the cost basis in the remainder.[4]

Furthermore, section 1033 of the Internal Revenue Code of 1954 allows a taxpayer to replace property which is being condemned by purchasing other property similar or related in service or use to the property so condemned, and when this is done no gain is recognized and no taxes are due. However, this must be done within one year after the close of the first taxable year in which any part of the gain upon the conversion is realized. In order to determine when this twelve months' period expires, one must first determine when the gain upon the conversion is realized. The Government says, according to counsel at oral argument, that the gain is realized when the deposit is made, but in its brief in our case it says that the gain was realized when the money was withdrawn by the taxpayer. Actually, there was no gain realized until the final judgment was entered, which was four years after the deposit was made. Under the theories of the Government, the taxpayer in this situation is both confused and bewildered

4.  See G.C.M. 23698, 1943 Cum.Bull., 340, 341, where it is stated:
    "If the condemnation proceeding does not include an assessment against the retained portion of the property, * * * any amount awarded as severance damages to the retained portion of the property is to be deducted from that part of the basis of the whole property which is properly allocable to the retained portion and, if in excess thereof, the amount of the excess constitutes taxable gain."

and is unable to determine when he could buy other property if he desires to escape any tax by doing so. He does not know whether the limitation period starts to run against him (1) when the deposit is made, (2) when he withdraws the deposit, or (3) when final judgment is entered. If he is bound to pay a capital gains tax when the deposit is made, as was advocated by counsel for the Government at oral argument, he would not know whether he would have a gain or loss on final judgment, and, in the meantime, if he has bought other property and on final judgment has no gain or loss on the property condemned, he will have purchased the other property without the necessity of doing so. Also, if he chooses not to withdraw the deposit and fights the condemnation case on the grounds that the condemnor is not entitled to condemn his property and wins the case, there will be no condemnation of his land, and if, in the meantime, he has bought other property to avoid a capital gains tax because the deposit has been made, he will have purchased property that he did not need to buy. If he withdraws the money and buys other property to avoid a tax, and on final judgment he has no gain or a loss, his purchase of the other property will have been unnecessary, to his detriment, and damage. We might well ask ourselves, what is a poor taxpayer, who is usually unsophisticated in such matters, to do in these circumstances?

The Federal cases of Keneipp v. United States, 87 U.S.App.D.C. 242, 184 F.2d 263 (1950) and Nitterhouse v. United States, 207 F.2d 618 (3d Cir. 1953), cert. denied, 347 U.S. 943, 74 S.Ct. 638, 98 L.Ed. 1091 (1954), cited by the concurring opinion of Judge Laramore, are not applicable to our case. They involve Federal condemnation proceedings under the Federal statutes. Our case is not a Federal condemnation, but is a proceeding to condemn land by the State of Texas under the eminent domain statutes of Texas. These Federal cases involve proceedings where the Federal Government condemned land under eminent domain statutes enacted by the Congress. These statutes and these cases do not govern the instant case for a number of reasons. In the first place, we are required to dispose of this case in accordance with the Texas law. See Henley v. United States, supra. In the next place, it should be pointed out that the Federal eminent domain statutes are different in many respects from the Texas laws governing condemnation in that state. For instance, 40 U.S.C. § 258a (1964), provides as follows:

> Upon the filing said declaration of taking and of the deposit in the court, to the use of the persons entitled thereto, of the amount of the estimated compensation stated in said declaration, title to the said lands in fee simple absolute, * * * shall vest in the United States of America, * * * and the right to just compensation for the same shall vest in the persons entitled thereto; * * *.

This statute and the cases decided thereunder provide that the title to the land being condemned vests immediately in the Federal Government at the moment the declaration of taking is filed in court and the deposit is made [5] and at the same time title to the deposit is vested in the condemnee. See United States v. Certain Interests in Property, 302 F.2d 201, 203 (2d Cir. 1962):

> 2. The fund deposited with the court is considered vested in defendant from the time it is deposited free of restriction. Bishop v. United States, 288 F.2d 525 (5 Cir. 1961); United States v. 53¼ Acres of Land in the Borough of Brook-

---

5. See United States v. 53¼ Acres of Land, 176 F.2d 255, 258 (2d Cir. 1949), where the court said:

"* * * An absolute taking of the property designated in the declaration takes all interests and gives the government a clear title to everything as of the date of the taking, A. W. Duckett & Co. v. United States, 266 U.S. 149, 45 S.Ct. 38, 69 L.Ed. 216 * * *; United States v. Foster, 8 Cir., 131 F.2d 3, * * *."

lyn, 176 F.2d 255, 258 (2 Cir. 1949); United States v. Certain Lands in the City of St. Louis, Mo., 41 F.Supp. 809 (E.D.Mo.1941), aff'd sub nom. O'Donnell v. United States, 131 F.2d 882 (8 Cir. 1942); United States v. 15.03 Acres of Land, etc., 253 F.2d 698 (2 Cir. 1958). Id. at n. 2.

This procedure must be contrasted with that in Texas where title to land being condemned does not vest in the condemnor and title to the deposit does not vest in the condemnee until final judgment is entered in the condemnation proceeding. See City of San Antonio v. Astoria, supra, and Culligan Soft Water Service v. State, supra. As has been pointed out above, these cases hold that the condemnor holds the land on a temporary basis and the condemnee holds the money on the same temporary basis until final judgment is entered in the case. The condemnor has no title to the land and the condemnee has no permanent right or title to the money until final judgment is entered. For all of these reasons, the Federal cases cited in the concurring opinion are not in point.

The concurring opinion also seems to assume that the lease agreement cases discussed in this dissenting opinion govern the rights of the plaintiff in the instant case. This reasoning ignores the fact that the plaintiff is entitled to prevail under the Texas law without any consideration of the lease agreement cases. It will be recalled that in the beginning of this opinion these Texas cases and authorities were discussed in detail. They show, without any question, that the deposit in court is still owned by the condemnor and not by the condemnee after the deposit is made and up until final judgment. They also show that the deposit is made as security to the condemnee and not in payment to him for his land. The condemnee merely has the temporary use of the money and not ownership of it. It is not until final judgment that the condemnee has title to any money. The lease agreement cases have been cited because the security given in those cases is similar to the security given the plaintiff in the instant case. Of course, the facts vary and this must be taken into consideration. The concurring opinion treats the deposits made by the lessees in the lease cases as "loans" and says that the lessor must repay to the lessee the amount of such deposits. In my opinion, these deposits in the lease cases do not have the characteristics of loans. In many of them the lessor was not required to pay any interest nor to keep the money in a separate deposit. In most of the cases, the lessor had the unfettered and unrestricted use of the deposits for his own purposes. In many of the cases, the lessor was not required to repay the deposit to the lessee, but could apply it upon rent due upon the last portion of the lease or as in the case of *Executors of the Estate of Barker,* supra, he could use the deposit to pay taxes, insurance, liens, or any other costs which the lessee failed to pay. It is true that the lessor had to "account for" the money, just as the plaintiff in the instant case had to account for the security deposit. In the lease cases, the lessor merely had the *temporary use* of the money. See Clinton Hotel Realty Corp. v. Commissioner, supra. In the instant case the plaintiff likewise only had the temporary use of the funds. It is true that some of the lease cases compare the security deposits therein made to borrowed money, but in so doing they were speaking in the sense that the security deposit was no more income to the lessor than borrowed money would have been. The same point has been made in this dissenting opinion, namely, that the temporary use of the security deposit by the plaintiff was akin to a borrowing. As stated above, both the lessors in the lease cases and the plaintiff in our case had to account for the security deposits at the end of the leases on the one hand and upon the entry of final judgment on the other. There is really no difference in these situations. It might be argued that the lessors in the lease cases were actually repaying the security deposits to the lessee, even though they

applied the money to the payment of lessee's obligations. The same argument could be made here in the instant case if we wish to engage in semantics. In other words, it could be said that the plaintiff, in effect, has to repay all of the security deposit which he has withdrawn by delivering it to the county clerk upon entry of final judgment, and the county clerk would, in turn, issue a new check to the plaintiff for the amount of the final judgment. In order to avoid this circuitous action by the plaintiff, he is allowed to strike a balance between what he has withdrawn and the amount of the final judgment and is allowed to either keep all of the money or return all or a portion of it as the final judgment may require. In any event, it is not gain to him until final judgment is entered.

The concurring opinion places emphasis on the fact that plaintiff was on a cash basis and that he actually received the money and used it. We have pointed out above that these facts are immaterial. As was stated in Harcum v. United States, supra, which was a lease case, the court said:

> * * * The fact that taxpayer operated on a cash, rather than on an accrual, basis does not lend support to defendant's position. * * * Id. 164 F.Supp. at 651.

I have already distinguished the cases of North American Oil Consolidated v. Burnet, supra; Healy v. Commissioner, supra; and United States v. Lewis, supra, cited by the concurring opinion, from the instant case in our discussion in the foregoing paragraphs, and, therefore, do not deem it necessary to consider them further.

In my opinion, it is as much the duty of the Government to protect a citizen against the unauthorized levy and assessment of taxes against his property as it is to collect taxes from him that have been duly and legally levied and assessed against his taxable property. I do not think the Government has lived up to this obligation here.

Actually, this case appears to be much ado about nothing. The taxpayer is not trying to avoid the payment of his taxes. He only seeks to pay them in the year in which they were due (1964). The judgment in the condemnation case was entered in 1964, four years ago. The taxes due by the taxpayer could be calculated, no doubt, in a few minutes and his taxes paid. Why, then, is the case before us? Giving the Government the benefit of all doubt, I assume that it wishes to establish a precedent that will govern all future Texas cases of this kind. I must recognize, however, the corollary propositions that it seeks to impose a penalty and interest against the taxpayer, and, also, the Internal Revenue Service, having taken a position on the problem here, seeks to defend it at all costs. I am not interested in the corollary propositions and I am concerned with the establishment of a precedent only insofar as it coincides with justice in the case before us.

The theories advanced by the Government here that a capital gains tax is owed by a Texas condemnee in an eminent domain case either (1) when the deposit is made, or (2) when the condemnee draws down the deposit, only cause confusion and create problems for both the taxpayer and the I.R.S. They will not only cause uncertainty, but will also result in many arguments, contests, and even lawsuits. If, as the Government contends, a taxpayer should be required to pay a capital gains tax in cases of this kind when he does not know whether he has a gain or a loss, or, in either case, how much, it will result in the filing of countless amended returns, refund claims, subsequent deductions, investigations, and eventual cases in court. All of this could be avoided by the all too simple practice of allowing the condemnee taxpayer to pay his taxes, if any, when the final judgment is entered in his case and when, for the first time, he knows whether he has a gain or a loss and how much. In this way, the taxpayer would be protected in his property rights and the Government would col-

lect the taxes rightfully due. The taxpayer is not entitled to more and the Government is entitled to no less.

Accordingly, I would hold that the capital gains realized by the plaintiff from the condemnation proceedings were taxable in 1964 and includible in plaintiff's gross income for that year, and would enter judgment for the plaintiff.

COLLINS, J., concurs in the foregoing dissenting opinion.